## FLAT-TOP FUEL CO., Inc., v. MARTIN.[*]

### No. 389.

Circuit Court of Appeals, Second Circuit.

July 13, 1936.

*Writ of certiorari denied 57 S. Ct. 110, 81 L. Ed. ——.

Lynch, Hagen & Atkins, of New York City (Horace T. Atkins, of New York City, of counsel), for appellant.

Thomas H. Middleton, of New York City (Hill, Rivkins & Middleton, of New York City, on the brief), for appellee.

Before MANTON, SWAN, and CHASE, Circuit Judges.

SWAN, Circuit Judge.

This is a libel in personam brought against the owner of a coal barge, Northern No. 29, by the owner of the cargo she was carrying when she sank on December 10, 1933. Both the vessel and her cargo were a total—loss. The libel contains two counts; one alleging a contract of carriage and a breach thereof by failure to deliver; the other in tort, on the theory that the respondent was negligent in supplying an unseaworthy barge for the transportation of the libelant's coal. The respondent's answer denied the making of a contract of carriage, denied that the barge was unseaworthy or that he was negligent in the respects alleged, and invoked the benefit of the limitation of liability statutes. The District Court refused recovery on the contract count, but granted it on the tort count and denied limitation of liability. From the interlocutory decree the respondent has appealed, while the libelant has filed cross-assignments of error because the contract count was not sustained.

Northern No. 29 was a wooden, coastwise coal barge owned by the respondent, Joseph P. Martin, and operated for him by P. F. Martin, Inc., a corporation for which he acted as agent at Norfolk, Va. In June, 1933, the barge was chartered to Marine Fuel Corporation to carry coal from Hampton Roads to Montville, Conn., during a term ending April 1, 1934, at an agreed hire per ton carried. Marine Fuel Corporation made a subcharter to the libelant at a higher rate per ton carried. Under this subcharter several cargoes had been safely carried for the libelant prior to the final voyage on

which the barge was lost. On each voyage freight based on the bill of lading weight had been paid by the libelant to Marine Fuel Corporation at 70 cents per ton, and the latter had paid P. F. Martin, Inc., 67½ cents per ton. The amount received by P. F. Martin, Inc., was credited to the account of the respondent. It was the custom at Hampton Roads to have the shore agent of the barge owner, instead of the master, sign the bills of lading because the barges were towed away from the dock to an anchorage as soon as loading was completed. Such a bill of lading was given with respect to the cargo in suit. It was prepared by the libelant, and its material portions read as follows:

"Shipped in good order and condition by Flat-Top Fuel Company, Inc., in and upon the Barge called the Northern No. 29 * * * two thousand and one half tons * * * which I promise to deliver in like good order alongside at the aforesaid Port of Montville, Connecticut (the dangers of the seas only excepted) unto Robert Gair Company or his or their assigns, he or they paying freight for the same at the rate of ——— per ton * * *.
"J. P. Martin, Master."

The respondent's name was appended by an authorized representative of his office.

Relying upon The Fri, 154 F. 333 (C.C.A.2), and The G. R. Crowe, 294 F. 506 (C.C.A.2), the District Judge held that the bill of lading was a mere receipt and not a contract of carriage. In the cases cited the charterer was the shipper, and it was ruled that a bill of lading given by the master should be considered as a receipt and not as a new contract or a modification of the terms of the charter party. The libelant seeks to distinguish them on the ground that here the subcharterer was the shipper so that no contractual relationship existed between owner and shipper which would be varied by ascribing to the bill of lading its normal effect as a contract. We do not think the attempted distinction is sound. Where both parties to a bill of lading intend it to operate as a receipt rather than a contract of carriage, its legal effect is merely that of a receipt. Such an intent is found when the shipper is the charterer. It may equally be found when the shipper is a subcharterer. He already has a contract of carriage with the charterer, and it cannot reasonably be supposed that

he means to contract with the shipowner for the same carriage. It is equally unlikely that the shipowner, having already contracted with the charterer, wishes to make an additional contract with the subcharterer, since he will earn no additional freight thereby from the latter. We regard the fact that the bill of lading left blank the space provided in the form for insertion of a freight rate as strong corroboration that both parties intended the bill of lading to serve merely as a receipt. It is true that Turner v. Haji Goolam, L.R.(1904) A.C. 826, contains a statement contrary to the view we have expressed, but it is not essential to the decision, which may well be supported on the ground that the shipowner had no lien on the subcharterer's goods for the time charter freight, as Scrutton suggests in commenting upon this case. Scrutton, Charter Parties and Bills of Lading (12th Ed.) p. 61. In our opinion the District Court correctly denied recovery on the contract count.

Hence the libelant must rely solely upon its tort claim. On December 5, 1933, the barge was loaded to less than her full capacity and towed to an anchorage. Her voyage began on December 7th. Nothing untoward occurred until the evening of December 9th when the captain discovered that she was leaking. Captain Styron testified that up to this time he had used the pumps morning and night, as was customary, and "she had been making no water to speak of." By 7 o'clock on the morning of the 10th the barge had taken in so much water that she had to be abandoned and shortly thereafter she sank. No wind or seas had been encountered sufficient to account for a seaworthy vessel springing a leak, and the District Judge concluded that the barge must have been unseaworthy when she broke ground. This finding we shall not disturb. But since Martin had no contract relations with the libelant, he neither expressly nor impliedly warranted her seaworthiness, and the duty he owed the libelant was not an absolute duty to have her seaworthy, but a duty not to cause damage to the libelant's property by the negligent use of her. The Cullen No. 32, 62 F.(2d) 68, 70 (C.C.A.2). This duty he could not satisfy without taking reasonable care to have the barge safe for carriage of the cargo which he knew was laden on her, and in effect would make

him responsible for any negligent failure of his servant, the barge captain, to ascertain the unseaworthiness of the barge. The unexplained sinking of the barge establishes for the libelant a prima facie case of such negligence. See The Kathryn B. Guinan, 176 F. 301, 302 (C.C.A.2); The William I. McIlroy, 37 F.(2d) 909, 910 (D.C.E.D.N.Y.), affirmed Burns Bros. v. The William I. McIlroy, 45 F.(2d) 1023 (C.C.A.2). Respondent has failed to rebut it. It is true that the barge was in dry dock as late as July, 1933, when her bottom was painted and her seams caulked to the light water line, and that the local inspector gave her a certificate of seaworthiness before loading began on December 5th. But these facts did not obviate the need for an adequate inspection by the owner or his servant before the barge embarked upon her voyage. It was not shown that Captain Styron made a sufficient examination preparatory to the fatal voyage. Aside from ascertaining by the pumps that she was taking only the normal daily amount of water, Captain Styron made what could have been, at most, a visual examination of the seams visible from the deck. He apparently relied on the local inspector, whose examination, however, was little better than his own and was made while the vessel was light. Cf. The Sundial, 43 F.(2d) 700, 702 (C.C.A.2). It is therefore unnecessary to take the extreme position urged by the libelant, namely, that nothing short of trying all the seams with a tool would be adequate examination, in order to hold, as we do, that respondent has failed to show inspection by his servant sufficient to rebut the presumption of negligence.

[8-10] Nevertheless, the respondent is entitled to limitation of liability, which is equivalent to exoneration since the barge was a total loss and there was no pending freight. The lack of due diligence which forfeits limitation must be personal to the owner. The Galileo, 54 F.(2d) 913, 914 (C.C.A.2), affirmed Earle & Stoddart v. Ellerman's Wilson Line, 287 U.S. 420, 425, 53 S.Ct. 200, 77 L.Ed. 403. The evidence negatives any negligence on the part of Martin himself. He did not undertake, himself, to determine the condition of the barge, but employed a competent master to look after her and to inform him of any needed repairs; and he was ready and able to make any repairs required. He had had the barge dry-docked for repairs in November, 1932, when he bought her, and again in July, 1933, at which latter time he instructed the drydock man to do whatever caulking necessary. Just prior to the fatal voyage the boat made a successful voyage to Camden, N. J. He had no reason to believe that she was in anything but good condition. Personal diligence on the part of a barge owner cannot require that the vessel be put on dry dock before loading. And it is not our understanding of personal diligence that the owner must appoint a special representative to inspect a barge every time she is about to load. He may rely on her master for such inspection, if he hires a man of experience and reputed efficiency and has the barge drydocked for overhauling at reasonable intervals.

Decree reversed, with directions to enter a decree in conformity with this opinion.