### THE W. H. DAVIS.

### THE BON.

### GENERAL MOTORS CORPORATION v. PETTERSON LIGHTERAGE & TOWING CORPORATION.

District Court, S. D. New York.

July 19, 1944.

Hill, Rivkins & Middleton, of New York City (Thomas H. Middleton, of New York City, of counsel), for libellant.

Macklin, Brown, Lenahan & Speer and Mahar & Mason, all of New York City (Leo F. Hanan and Frank C. Mason, both of New York City, of counsel), for respondent.

CONGER, District Judge.

Libellant, General Motors Corporation, sues for the loss of a shipment of boxed automobiles and automobile parts which were on board the Lighter W. H. Davis.

There are three causes of action set forth in the libel. The first two causes of action are against the respondent Petterson Lighterage & Towing Corporation and the Deck Lighter W. H. Davis.

The third cause of action is against the respondent Petterson and the Motor Tug Bon.

The incident out of which this cause of action arose is as follows: Libellant on January 24, 1941 was shipping certain boxed automobiles and automobile parts from its plant at Tarrytown, New York.

For some time prior to January 24, 1941, respondent had been acting as Libellant's carrier in the transportation of automobiles and parts by water from Tarrytown to various points in New York Harbor.

Respondent was the owner of the Deck Lighter W. H. Davis and Tug Bon. On or about January 21, 1941 respondent delivered at libellant's dock two empty lighters, one of which was the Lighter Davis.

These lighters were loaded and within a day or two thereafter libellant notified respondent that the lighters had been loaded. Respondent pursuant to custom thereupon sent two empty lights to Tarrytown and proceeded to take charge of the two loaded lighters for the purpose of towing them to New York.

From libellant's dock to the main channel in the Hudson River, there is what has been termed here as a private channel.

This channel is of sufficient depth and width to allow boats to go from libellant's dock to the main channel. On the morning of January 24, 1941 the Tug Bon proceeded to tow the two lighters out to the main channel in the river.

There was ice in this private channel and the Tug Bon, before starting towing, broke this ice in the channel well out in the river. The tug then returned and took the Davis and the other lighter in tow with the Davis just astern of the tug by a short hauser and the other barge behind the Davis. The stern of the lighter Davis was about three feet from the stern of the tug. The Davis was being towed stern first. The tug was proceeding at half speed, which has been estimated at about one mile an hour.

After the tow had been traveling about 1800 feet and was at or near the main channel the lighter Davis listed and dumped a part of her load of automobiles in the water.

It was subsequently learned that the lighter Davis had sprung a leak which caused her to list and eventually sink.

■ The third cause of action is really based on negligence. The gravamen of that cause of action is as follows: "The Bon so negligently and carelessly conducted the said towage that the lighter Davis was caused and allowed to spring a leak due to contact with ice."

As to this third cause of action I find that libellant has failed to sustain its contention. The tug was not proceeding at an excessive speed; there was nothing about the manner of the hook-up of the barges which was unusual or negligent; there was nothing to indicate any negligence on the part of the Tug Bon in the manner and means in which the tow was being conducted and carried out. I find against the libellant on this cause of action.

The first two causes of action are based on a breach of contract (oral) by reason of the fact that this shipment was delivered to the respondent and the Lighter Davis and that they failed to deliver the shipment in accordance with the contract by reason of the Davis springing a leak (first cause of action).

The second cause of action is based on the same allegations except that in this cause of action there is a further allegation that failure to deliver the shipment as contracted was due to the fact that the lighter

because of her unseaworthiness and her inability to withstand conditions reasonably to have been anticipated on a voyage in the Hudson River at the time she sailed developed a leak which caused her to list and dump a part of her load overboard.

If the libellant recovers in this action it must be upon either one or both of these causes of action.

Generally the facts from the inception of this voyage up until the time of the listing of the barge are not in dispute. The weather was not severely cold; there was ice in the private channel. The ice had been broken prior to the starting of the voyage by the tug. The conditions were not unusual for this time of the year.

There is no question from the evidence that the Davis was caused to list by reason of a hole in her stern. It was on the port side near the corner, about seven or eight planks down. The hole was below the loaded water line but above the light water line. The hole in the stern was observed by several men at the time. They all described it as about 4″ wide and about 12″ to 15″ long. The lighter was subsequently towed to New York "sunk deck to." She arrived at Lord's Dry Dock at Weehauken, New Jersey, the end of January or the early part of February. The barge was then drawn up on the beach and the stern was exposed. It was then found that this plank was seriously damaged and broken much more extensively than had been testified to by the witnesses. Just how this further damage was occasioned was not explained. It may very well have happened at Tarrytown and was not observed because of the listing of the boat. When the barge was at Lord's Dry Dock the damaged portion was removed and the hole covered by canvas. Unfortunately this damaged plank was not preserved.

Subsequently the lighter was taken to Swenson's Shipyard in Jersey City; a survey was held there on February 4, 1941. The canvas was then removed. This left, of course, a hole about 11′3″ long. The whole plank was 33′ long and 10″ wide.

There is no question but that this hole on the bow stern of the lighter allowed the water to enter the barge and caused her to list. There were tests made by the surveyors who examined the barge on February 4, 1941. They were practically unanimous in their opinion that there was no other condition of the lighter which

indicated that water might enter at any other place.

No one seemed to know the age of this lighter. One witness testified that she was at least twenty years old. From the testimony and exhibits in the case I am satisfied that the lighter was not in A-1 condition.

■ As I see it, libellant may only recover here by showing that the barge was unseaworthy in that she was not reasonably fit to undertake the voyage. In other words, that she was not reasonably fit to transport the cargo through conditions which were normal for the season and which were known to respondents.

■ Respondent was under the duty to furnish libellant with a seaworthy vessel. There is an implied warranty of seaworthiness in all maritime contracts for transportation of cargo, which may be negatived only by express covenant. It is as much a part of the contract as any express stipulation. Cullen Fuel Co., Inc., v. W. E. Hedger, 290 U.S. 82, 54 S.Ct. 10, 78 L.Ed. 189.

This is true whether the ship be a private or a common carrier. The Framlington Court (Newfoundland Export & Shipping Co. v. United British S. S.), 5 Cir., 69 F.2d 300.

Libellant, therefore, argues, that the burden of proof as to the seaworthiness of the barge at all times 'is upon the respondent and that libellant proves its case by showing that it delivered the cargo in good condition to the carrier and that the cargo sustained damage while in the carrier's possession. This precise question has vexed the courts for many years. It has now been separately passed on by the U. S. Supreme Court. Commercial Molasses Corp. v. New York Tank Barge Corp., 314 U.S. 104, 62 S.Ct. 156, 86 L.Ed. 89.

This contract of affreightment was for private carriage on the Hudson River. The carrier in this case was not a common carrier but a private carrier. There is a distinction between the two as to the burden of proof.

■ The burden of proof of seaworthiness rests upon the shipowner who is a common carrier not because he is an ordinary bailee but because he is a special type of bailee who has assumed the obligation of an insurer. The burden rests upon him to show that the loss was due to an excepted cause which the law itself annexes to his undertaking and that he has exercised due care to avoid it.

Such a carrier can only relieve himself of liability by proof of certain permitted exceptions and not to his breach of duty to furnish a seaworthy vessel. In that case since the burden is on the shipowner, he does not sustain it, and the shipper must prevail if, upon the whole evidence, it remains doubtful whether the loss is within the exception.

■ In this case respondent, being a private carrier, has the status of a bailee for hire. A bailee for hire is not an insurer. His undertaking is to exercise due care in the protection of the goods committed to his care and to perform the obligations of his contract including the warranty of seaworthiness.

■ The burden of proving a breach of that duty or obligation rests upon him who must assert it as the ground of the recovery which he seeks (in this case the libellant). The burden rests upon the bailor (libellant) to prove some breach of duty or obligation other than the mere failure to return the goods or the mere failure to deliver the goods in an undamaged condition. This burden of proof does not shift.

■ Then the burden of going forward with the evidence devolves on the other party. This is not a shifting of the burden of proof but a shifting of the burden of going forward with the evidence. In the last analysis, when the evidence is all in, the bailor (libellant) has still the burden of persuasion. He has still the duty upon the whole case of proving the breach of duty of due care by the preponderance of evidence.

In making out his prima facie case, that is proof of the alleged breach of duty, libellant has the aid of certain inference, i. e. the unexplained failure of the bailee to return the goods, or to deliver them in an undamaged condition and the sinking of the barge under the conditions as shown by libellant. This is sufficient to make out a prima facie case. Then the law lays the duty on the bailee of coming forward with the information available to him to show the cause of the loss and to show that it was one not involving the bailee's liability. If the bailee (respondent) fails, it leaves the court free to draw an inference unfavorable to it upon the bailor (libellant) establishing the unexplained

568

failure to deliver the goods safely or in an undamaged condition.

If there is any doubt it should be resolved in favor of the bailee, since the bailor has the burden of persuasion. 314 U.S. supra; See also Commercial Molasses Corp. v. New York Tank Barge Co., 2 Cir., 114 F.2d 248; Kohlsaat v. Parkersburg & Marietta Sand Co., 4 Cir., 266 F. 283, cited with approval in 314 U.S. 104, 62 S.Ct. 156, 86 L.Ed. 89, supra.

■ Applying the above yardstick of the law to the present controversy, I feel that the libellant should succeed. In the first place it made out a prima facie case. Then on the whole case I feel it has sustained the burden of proof placed upon it.

Below will be found my reasons for coming to this conclusion.

Just before being towed out into the river, the Barge Davis was apparently all right and apparently loaded all right. She was just behind the tug (about three feet); she was being properly towed and not at an excessive speed. Her path was through ice but the ice had previously been broken up for a width of about 50 feet. The captain of the Tug Bon testified that the ice was soft and weak. He had come in the night before with two empty barges and encountered no difficulty. He said that the channel had frozen over during the night; as he said, "Maybe an inch or so." The tug had no difficulty in breaking through the channel. The tug felt no jar, neither was it stopped in breaking through the channel.

On the way out with the Lighter Davis the tug was not stopped by any ice; her captain felt no unusual jars, and Captain Grimes (the tug captain) testified that the ice conditions were not unusual or extraordinary; that he had towed boats of the same type in heavier ice conditions without difficulty or damage; that on this day he anticipated no trouble in going out. The captain of the lighter was in his cabin as the lighter was being towed out. He neither felt or heard anything unusual. His attention was first called to the fact that something was wrong by the sudden listing of the lighter. I quote the lighter captain's testimony:

"Q. Did you feel or hear anything? A. Sure. The ice was knocking against the boat." (Ooschock, 61); and "I went down in the cabin to the stove, and just when I was in the cabin and the boat was on the end of the channel, the boat started to list on me and I opened the door and saw the water coming in, and at the same time I heard the deckhand hollering, 'John, oh, John'"; and also:

"Q. Now as you were being towed out you heard ice knocking against the boat? A. Yes, sir.

"Q. That is something you always hear in ice? A. Yes.

"Q. And you still heard the same knocking when you felt the list? A. Yes."

I have also taken into consideration that this lighter was of uncertain age (upwards of 20 years); that photographs of her introduced into evidence indicated that she had had rather hard usage and showed signs of it; that for at least five years she had been running back and forth between Tarrytown and New York mostly in the wintertime and through ice and yet according to the testimony of Captain Ooschock, who had been captain of the lighter for the five years before the accident, the lighter had not been put in dry dock in all that time. There was some testimony that the lighter was inspected in 1939 and some minor repairs made. There is some evidence, not too definite, that the lighter was recaulked in 1938. On the whole there was a dearth of testimony on the part of the respondent as to any systematic repairs or inspection of this vessel.

■ One who for hire furnishes lighters for service in carrying valuable cargoes certainly has a duty to have them inspected and examined so as to be sure of their condition. This is all the more so when the lighters travel during the winter with its usual ice conditions in the river. The Northern Belle, 154 U.S. 571, 14 S.Ct. 1166, 19 L.Ed. 748.

I can only conclude that the Lighter Davis was not reasonably fit for the voyage she was undertaking because the voyage was of exactly the kind she would expect and that, therefore, she was unseaworthy. Franklin Fire Ins. v. Royal Mail Steam Packet Co., 2 Cir., 58 F.2d 175.

Respondent knew there was ice in the river and expected to run through ice. I cannot conceive that the misfortune to the lighter was caused by a peril of the sea, or an act of God or inevitable accident. I can only conclude that the accident to the lighter was caused because she was not fit for the voyage through the ice which was not unusual or unexpected.

Sargent Barge Line v. The Wyomissing, 2 Cir., 127 F.2d 623.

In coming to my conclusion I have not taken into consideration the fact that the Davis was not sheathed for protection against ice; the testimony in the case by all of the experts was that it was not customary, usual or necessary to have ice sheathing on vessels in New York Harbor or the Hudson river (at least as far as Tarrytown).

I am not prepared to hold that the Davis was unseaworthy because of the lack of sheathing.

Respondent produced a number of surveyors who inspected the Davis several weeks after the accident. At that time she was on dry dock and the damaged plank had been removed to the extent of at least half its length. All of these experts gave their opinion from their examination that the Davis on the day she left Tarrytown was reasonably fit to carry her cargo. Unfortunately none of these surveyors saw the damaged plank. They all agree that the ice condition as described by the captain of the Tug Bon could not have broken a sound plank.

It was unfortunate the surveyors were unable to see the damaged plank; they only saw the hole left where the plank had been. They did not have the opportunity to see the place where the leak occurred. This missing plank would have been a most important exhibit in the case. It seems to me rather significant that it was not saved. Two of respondent's employees testified they pulled it out and threw it away.

I can't hold with respondent that the damage to the lighter was caused by contact with heavy ice or some submerged object. There is nothing in the evidence to sustain such a contention. There is no question but that the damage was caused by ice but there is nothing to sustain respondent's contention that it was caused by heavy ice. The only testimony in the case which might bear out respondent's claim in this regard is the testimony of the surveyors; but they did not see the damaged plank.

Libellant is entitled to a decree against the respondent, in personam and against the Lighter Davis for its damage, interest and costs.

Settle decree on notice.