ROMANO et al. v. WEST INDIA FRUIT & STEAMSHIP CO., Inc.

THE SONIA II.

NORTH CARIBBEAN TRANSPORT CO., Limited, v. WEST INDIA FRUIT & STEAMSHIP CO., Inc.

No. 11317.

Circuit Court of Appeals, Fifth Circuit.

Nov. 14, 1945.

Rehearing Denied Dec. 27, 1945.

Carl T. Hoffman, N. J. Durant, Sam C. Matthews, and Fred Botts, all of Miami, Fla., for appellants. ·

Dewey Knight, of Miami, Fla., for appellee.

Before HUTCHESON, WALLER, and LEE, Circuit Judges.

HUTCHESON, Circuit Judge.

These appeals are from decrees entered in two admiralty suits consolidated for trial and appeal. Brought by the sub-charterer, "West India," one against the charterer, "San Juan," the other against the ship, "Sonia II," they concern a cargo of bananas loaded at Cristobal, Panama, and discharged at Miami, instead of at West Palm Beach, Florida, as had been agreed.

The claim of the libels was: that the bananas had been loaded green at Cristobal, and if properly carried to destination as agreed would have arrived safely and been worth on arrival $13,025; that by reason of the breach by ship and charterer of the agreement that the ship would sail

from Cristobal June 15th, and of the warranty that the vessel was of nine knot speed, and particularly by reason of the delivery of the cargo at Miami instead of at West Palm Beach, the cargo became a total loss.

The charterer denied that there was a breach of an agreement as to sailing time, and that there was a warranty of nine knot speed. Denying that the bananas had been loaded green, and that there was any unjustifiable deviation, it alleged that the bananas were ripe or semi-ripe when loaded and that because of their over ripe condition, they were already damaged when they arrived off Miami. There was a cross-libel for the freight, $6,975, and for $244.77 costs of handling the bananas in excess of their returns.

North Caribbean Transport Company, owner of the Sonia II, answering the libel against it, denied, as the charterer had done, that there was any breach of agreement as to sailing time, any warranty as to the vessel's speed, and that the bananas were loaded green. It alleged that they were loaded ripe or turning and had when they reached Miami, by reason of their inherent vice, already become a total loss.

The district judge heard the case on oral testimony. Of the opinion that carrying the bananas to Miami instead of West Palm Beach, was an unjustifiable deviation and that, because of it, the ship should be condemned to pay $13,025, the value of the bananas at West Palm Beach, Florida, if they had arrived in good condition, he passed without decision the other claims that the ship had failed to sail on time and that she had breached her warranty of speed. Concluding that San Juan should have judgment for the subcharter hire but not for the $244.77, net costs of disposing of the cargo, and that since the two suits were consolidated, one decree would suffice for both, he gave judgment condemning the ship to pay $13,025 and libelant's costs, $6,975, to the San Juan Shipping Company and $6,050 plus $140.38 costs to West India Fruit Company, libelant.

North Caribbean Company, claimant of the Sonia, is here insisting that the court erred in condemning the ship at all, because (1) demised to, and in full control

of the charter and sub-charterer, neither of them has a cause of action against the ship; (2) if mistaken in this, the ship was not liable because (a) the bill of lading authorized the deviation to, and discharge of, the cargo at Miami, and (b) if it did not, the deviation caused no damage because, at the time it occurred, the bananas were already in a damaged and worthless condition through the fault not of the ship but of the cargo owner in not loading them green. It, therefore, seeks a decree of reversal.

San Juan is here complaining, not, of course, complaining of the failure to award a decree against it on West India's libel, nor, more than in a technical sense, that a decree was awarded it against the ship. Its real complaint is of the failure to give judgment on its cross-libel against West India direct for its charter hire and its net costs of handling the cargo. It, therefore, though arguing that West India is not entitled to any recovery, seeks merely for itself a judgment against West India for charter hire and costs. West India, appellee in both the cases seeks merely to have the decree affirmed.

On the argument, West India insisting that San Juan was fully protected by the decree it got against Caribbean but conceding that it was entitled to a decree against it for the freight, it was in effect agreed between it and San Juan that San Juan should have judgment here against West India for the charter hire but not for its extra costs, and such controversy as there was between these two has been composed.

On the appeal of North Caribbean, we dispose of its primary contention, that the Sonia II was demised and the charterer and not the owner was responsible for her defaults, by saying that under settled law the charter was not one of demise. While it is sometimes difficult to determine whether a particular charter amounts to a demise of the ship, the rule is clear that there is a demise where the charterer is given the possession and control of the vessel, but not where he acquires merely the right to her services.[1] Without setting out the terms of the charter, it is sufficient to say that, under the authorities,[2] they leave in no doubt that the

[1] 48 Am.Jur., sec. 297, p. 203; United States v. Shea, 152 U.S. 178, 14 S.Ct. 519, 38 L.Ed. 403; Federal Forwarding Co. v. Lanasa, 4 Cir., 32 F.2d 154.

[2] 48 Am.Jur., secs. 296–300; United States v. Shea, 152 U.S. 178, 14 S.Ct. 519, 38 L.Ed. 403; The Capitaine Faure Coop-

Sonia II was not demised and that there is no merit in the claim that the charterer and not the owner was liable for her defaults. On the question whether the ship was in default and what her defaults were, we find no difficulty in agreeing with the district judge that there was a deviation in taking the ship into Miami, that the deviation was unjustified, and that the ship is liable for all loss resulting from such deviation.[3] The owner's reliance on Par. 12 of the bill of lading,[4] declaring that the carrier shall not be charged with deviation under conditions there set out, will not at all do. In the first place, where a bill of lading is issued by the master to a charterer who has contracted for the full capacity of the ship, the bill of lading is merely a receipt and not a contract,[5] and its provisions cannot affect or modify the liability of the ship. But, if we could assume that the bill of lading was contractual and that the provision for deviation in it would, if complied with, exonerate the ship, this would not help appellant. For such a provision is not an absolute one, but must be given reasonable interpretation, and the discretion conferred may not be exercised in an arbitrary or unreasonable manner or without substantial grounds. Good faith, therefore, will not alone suffice.[6] The evidence, that the disturbance which the master made the excuse for going into Miami was a mild one, is greatly preponderating, and it is quite clear that but for his ignorance of the real depth at West Palm Beach,[7] he would not have made the deviation. This being so, it is quite clear that it was not a justifiable exercise of his discretion and that, therefore, neither generally nor under the invoked clause of the bill of lading, may the ship be excused from liability for its consequences.

What, then, were the consequences of the deviation?[8] The libelant claimed, and the district judge found, that they were the whole loss of value of the cargo. The respondent claimed that the preponderance of the evidence establishes that the bananas were already a total loss when the ship reached Miami and that if carried to West Palm Beach they would have been a total loss there. While the respondent was incorrect in its claim that the whole damage was done before the deviation occurred, we think it clear that the district judge was also wrong in finding that all of it occurred afterward and as a result thereof. The record leaves in no doubt that when the bananas were examined at Miami, after the ship had berthed there, a great part of them were, and had for some time been, in a bad condition, and that while the estimate of respondent's witnesses, that they were al-

er & Cooper, Inc. v. Cameron et al., 2 Cir., 10 F.2d 950.

3 SS Willdomino v. Citro Chemical, 272 U.S. 718, 47 S.Ct. 261, 71 L.Ed. 491; The Malcolm Baxter, Jr., 277 U.S. 323, 48 S. Ct. 516, 72 L.Ed. 901; St. John's N. F. Shipping Corp. v. S. A. Companhia Gen. Com., 263 U.S. 119, 44 S.Ct. 30, 68 L.Ed. 201.

4 "If threatened or existing conditions of * * * weather * * * in the master's * * * opinion * * * the vessel is likely to be prevented or delayed from reaching or from entering any port, or delayed in making due delivery, * * * or if in the master's * * * opinion the * * * discharging of the goods cannot be effected in whole or in part, the carrier, without notice of any kind or nature to the shipper or consignee is authorized, with all, part or none of the goods on board, * * * without proceeding to or toward or entering or attempting to enter the interdicted port, to proceed to the * * * nearest practicable port, * * * and to discharge the goods * * * in that port, or in any other port at its convenience, * * * or to retain the goods on board and even to bring them back to the point of departure, all at the expense, risk and peril of the owners of the goods; * * * in these various cases, the carrier shall not be charged with deviation and shall be completely liberated by the discharge and the same shall be a fulfillment of the voyage referred to herein."

5 The Fri, 2 Cir., 154 F. 333; The G. R. Crow, 2 Cir., 294 F. 506; Unterweser v. Potash, 5 Cir., 36 F.2d 869; Flat-Top Fuel Co. v. Martin, 2 Cir., 85 F.2d 39 (a case, as here, of a charter and a sub-charter).

6 The Wildwood, 9 Cir., 133 F.2d 765.

7 As to the failure to have proper charts and publications on board the ship and to have the master properly advised of conditions at the port of destination, cf. the Edwin I. Morrison, 153 U.S. 199, 14 S.Ct. 823, 38 L.Ed. 688; Knauth on Ocean Bills of Lading, p. 144; The Maria, 4 Cir., 91 F.2d 819, 824; The Framlington Court, 5 Cir., 69 F.2d 300; The Fred E. Hasler, 2 Cir., 55 F.2d 919; Texas & Gulf v. Parker, 5 Cir., 263 F. 864.

8 See authorities under note 3, supra.

ready then a total loss, is unreasonably high, the witnesses testifying most favorably for the libelant swore that not more than 50 to 75 per cent of them could be salvaged. In this state of the record, the district judge's finding that, as a result of the deviation, libelant sustained a total loss of the bananas, may not stand, and, if deviation were the sole fault, the judgment for libelant would have to be reduced accordingly. In addition to the fault of deviation, however, libelant has all along relied on (1) the lateness of the ship's sailing from Mayaguez to Cristobal, and (2) breach of warranty as to the vessel's speed. As to the claimed late sailing, the record will not support a finding that any of the damage was due to this cause. It is true that, in chartering the Sonia, "West India" did state, "It is understood the vessel now is in Mayaguez and is to sail not later than Thursday noon for Cristobal," and the proof shows that the Sonia did not sail on that day but a day or so later. But the sailing date was not warranted, the libelant was notified of the delay in ample time to have protected itself from a too early cutting of the bananas, and such damage, if any, as might have been caused by the too early cutting could not be said to be the proximate result of the delay. Besides there was no exception to the notation of the bill of lading that the bananas were loaded green, and we do not find that the damage suffered can be laid to the late sailing or to a too early cutting.

As to the speed of the vessel, however, the matter stands differently. The charter party contained this positive and unequivocal declaration: "Speed of nine knots per hours," and the evidence shows that she did not make this speed from Cristobal, with the result that she was many hours late, enough hours, indeed, in view of the condition of the bananas on arrival, to account, with the consequences of the deviation, for all the loss that occurred. If, then, this statement is a warranty, the judgment must be affirmed. The owner, agreeing that the speed of a vessel may be warranted, insists that the inserted clause was not a warranty at all because not expressly declared to be. But this will not stand up under the authorities. As Denholm Shipping Co. v. W. E. Hedger Co., 2 Cir., 47 F.2d 213 points out, the failure to use the word 'warranty' in a statement of this kind is unimportant. What is important is whether the statement was positively and unequivocally made as a statement of fact and whether the natural tendency of its making was to induce the chartering of the ship. The charter showed that the trade for which the ship was engaged, that is that she was to run in, was between ports in Florida, the West Indies, Central America, the Caribbean Sea, Mexico, and certain ports in the northern part of South America. In subchartering, there was discussion of the speed of the vessel, and to support his assurance that she could and would make nine knots, the charterer drew to the subcharterer's attention the affirmation of the written charter that the vessel was of that speed. The statement was a warranty and the ship is liable for damages resulting from its breach.

The judgment is, therefore, affirmed.