Petition of RELIANCE MARINE TRANSP. & CONST. CORPORATION.
THE M. J. WOODS.

RELIANCE MARINE TRANSP. & CONST. CORPORATION v. THE TUG SKIPPER.

OLDS & WHIPPLE, Inc. v. THE TUG SKIPPER et al.
Nos. 4369, 4370, 4388.

United States District Court
D. Connecticut.
Feb. 3, 1950.

Mahar & Mason, New York City, for Reliance Marine Transp. Corp.

Macklin, Speer, Hanan & McKernan, New York City (Albert J. Merritt, Bridgeport, Conn., and Leo F. Hanan, New York City, of counsel), for respondent-claimant James McWilliams Blue Line, Inc.

Hill, Rivkins & Middletown, New York City (Thomas H. Middleton, New York City, of counsel), for libelant Olds & Whipple.

HINCKS, Chief Judge.

This case is concerned with the liabilities resulting from the sinking of a barge owned by Reliance Marine Transportation and Construction Corp. while under tow by the tug Skipper owned and operated by James McWilliams Blue Line, Inc., and while carrying a cargo owned by Olds & Whipple, Inc. The case comprises three proceedings in admiralty, the parties having stipulated that all three proceedings be heard simultaneously and that the testimony, findings and conclusions shall apply equally in all three. (1) Reliance Marine Transportation & Construction Corporation, the owner of the lost barge, has petitioned for limitation of liability under 46 U.S.C.A. §§ 183–185 and in the limitation proceeding claims have been filed by James McWilliams Blue Line, Inc., the charterer of the barge, and Olds and Whipple, Inc., owner of the cargo lost with the barge. (2) The owner of the lost barge has also filed a libel against the tug Skipper, owned by the McWilliams Company which appeared as a claimant, alleging negligence on the part of the tug and claiming damages for the loss of the barge. (3) The cargo-owner has filed a libel against the tug Skipper, the barge M. J. Woods, and McWilliams Blue Line claiming damages for the loss of the cargo.

### Combined Findings

1. Reliance Marine Transportation & Construction Corporation (hereinafter called the barge-owner) is a corporation organized under the laws of the State of New York and was the owner of the barge M. J. Woods.

2. James McWilliams Blue Line, Inc. (hereinafter called the carrier) is a corporation organized under the laws of the State of New York and was the owner of the tug Skipper.

3. Olds & Whipple, Inc. (hereinafter called cargo) is a corporation organized under the laws of the State of Connecticut, and was the owner of a cargo of superphosphates, laden on the barge M. J. Woods on or about January 27th, 1948 at Carteret, N. J., for delivery to New Haven, Connecticut.

4. The barge Woods was seventeen years old, built of wood except for steel decks and cabin roof, with a wedged wooden bottom, and was without sheathing at her bow, but carried sand-irons of both sides which protected the junction of the bottom planking with the side planking. She had a length of 112 feet, a beam of 34 feet and a depth, amidships, of 13½ feet and a capacity of 1,000 net tons. Bottom wedges such as hers generally require replacement after twenty years. Prior to the voyage in question she had last been dry docked in April, 1946; at that time examination disclosed that her bottom and planking so far as observable were sound, but the sand-irons with which she was equipped were not then removed to permit examination of the condition beneath. In July, 1947, her scarfs, nibs and chines were searched and hardened in by her owner, and left in a sound condition. On September 21, 1947, she had come into contact with a lock wall in the New York State Barge Canal: although the contact was not particularly heavy and resulted in no visible breakage it was sufficient to start her caulking. On December 3, 1947, her owner again, and again without dry-docking, searched scarfs and nibs. Thereafter, she was hired out to carry grain in and about New York and was engaged in such carriage until chartered to the carrier as stated in Par. 7, below.

5. The tug Skipper, owned and operated by the carrier, was a diesel tug of 146 gross tons, 99 net tons, 82 feet in length, 24 feet beam, 10 feet, 6 inches depth of hold; she was built in 1944 and was of 700 horsepower. At all times hereinafter mentioned she was seaworthy: indeed, her seaworthiness has not been questioned in these cases.

6. On or about January 26, 1948 cargo entered into a contract of carriage with the carrier whereby carrier was to transport 900 tons of superphosphate from Carteret, N. J. to New Haven, Connecticut. The contract was not in writing but it was orally agreed that the carriage should be on the terms and subject to the conditions stated in the carrier's printed freight tariff effective November 27, 1946, copy of which the carrier had previously issued to cargo and which had controlled their prior dealings. This

tariff showed a rate for the transportation here involved of $1.00 per ton for a minimum cargo of 900 tons and a somewhat higher rate for somewhat smaller cargoes and the parties clearly contemplated that the transportation should be accomplished by a barge under tow. The carrier's printed tariff also stated that transportation thereunder was subject to the Carriage of Goods by Sea Act of 1936, 46 U.S.C.A. § 1300 et seq., and to the Harter Act, 46 U.S.C.A. § 190 et seq. Cargo and carrier intended that this contract should embrace the terms and conditions of this so-called tariff. The barge-owner was neither party nor privy to this contract.

7. To accomplish the undertaking assumed by the foregoing contract the carrier orally by telephone to the barge-owner's New York office arranged for the use of the barge Woods for the voyage in question, the barge-owner to receive 40¢ per ton. The arrangement was made through one Woods who was in charge of barge-owner's New York office with authority to make such a contract, but, so far as appears, without authority over or responsibility for the operation, maintenance, repair or inspection of the barge. The barge, with bargee, was made available to the carrier in accordance with this agreement, and the carrier who received and used the barge wholly without examination or inspection acted without due diligence to make the barge seaworthy.

8. The barge left Carteret on January 28, 1948 under tow by the Skipper, after taking on cargo, without prior inspection so far as appears. On the morning of January 30th, 1948 the flotilla arrived at New Haven Harbor and the tug-captain brought the barge to the stakeboat maintained by the carrier in New Haven Harbor at an anchorage located southerly of the end of the Long Wharf and westerly of the main channel, generally abreast of buoys 18 and 20. The barge was no sooner made fast to the stakeboat than it began to sink, whereupon it was cut loose and propelled by the tug toward shallower water. It sank before going far and was abandoned by its owner.

9. On entering the harbor, the tug shortened its line and brought the barge in to the stakeboat on a short hawser from her stern bit to the mid-bow bit of the barge carefully and without incident, in quiet water by a course largely free from solid ice. Broken ice was encountered but no heavier than was to be expected for the season and place when the charter was accomplished. It was not proved that the sinking was caused by collision with ice or, if so caused, that the carrier or tug was negligent.

### Discussion

The foregoing finding is supported by the testimony of the tug-captain, his deck-hand and the captain of the stakeboat, also an employee of the carrier. It was further supported by credible and undisputed evidence that earlier that day tugs with tow had used the main channel and that at least one tug had broken up the ice in the water between the main channel and the stakeboat and in the vicinity of the stakeboat. Indeed, shortly before the sinking a tug had circled the stakeboat, had picked up a barge tied thereto, and had taken it out of the harbor.

The finding, it is true, was at variance with the testimony of the bargee. He maintained that while in the outer harbor the tug made fast alongside on the starboard and rammed the barge with great violence against solid ice. His testimony, however, was permeated with much confusion: due possibly to the excitement incidental to the sinking he may easily have confused what happened before the barge was tied to the stakeboat with what happened afterward when in a desperate effort to beach the barge it well may have been propelled into ice not broken by earlier navigation. And it is hardly likely that the tug would have chosen a course through solid ice when according to undisputed testimony an open channel was available.

Nor does the diver's report impugn my finding. His examination was made six months after the accident and was confined to the planking above the bottom. True, lengths from two bow planks, which may have been somewhere near the loaded water line, were then found to be missing. For aught that appears, however, this condition may have resulted from pontoons serving a

dredging operation which by undisputed evidence had been moored in the vicinity after the sinking and before the diver's examination. Also one would expect that damage from ice would result in planks stoved in rather than in lengths of plank completely missing. And if caused by ice the contact may have occurred during the beaching effort after the barge began to sink. Moreover, it appeared that the barge-owner had caused an earlier diver's examination to be made, the report on which was never offered in evidence. The unexplained failure to offer a report of the earlier examination serves somewhat to increase the inconclusive tenor of the later one.

10. The barge sank without credible evidence of cause sufficient to account for the sinking of a seaworthy barge.

11. The sinking was caused by the unseaworthiness of the barge and taking into account all the evidence and the inferences to be drawn therefrom I find that the barge was unseaworthy when received by the carrier from the barge owner.

## Discussion

In making this important finding I do not overlook the case of Commercial Molasses Corp. v. New York Tank Barge Corp., 314 U.S. 104, 108, 62 S.Ct. 156, 86 L.Ed. 89, in which, that being a case of private carriage, it was held that the cargo-owner had not sustained the burden which the law placed upon it of proving that the sinking was due to the unseaworthiness of the barge. There, to offset any inference of unseaworthiness from the sinking in quiet water, there was considerable evidence which left the cargo-owner's claim of unseaworthiness in doubt. There, for instance, there was evidence of improper stowage of the cargo. And, perhaps even more important, there was evidence that, as the Supreme Court noted, 314 U.S. at page 114, 62 S.Ct. at page 162, "inspection of the barge before the loading began (which had been made by the cargo-owner) and after she sank, *and again after she was raised,* failed to disclose any persuasive evidence of unseaworthiness." Necessarily, the effect of thorough examination of the hull after raising which failed to show a defect, was greatly to diminish the force of the inference of some defect in the hull which caused the sinking: such examination in practical effect eliminated some defect in the hull as a probable cause. In any event, the trial judge there found the weight of evidence for and against unseaworthiness so closely matched as to leave the issue in doubt. Here, however, the examination of the hull was inconclusive for the reasons stated under Par. 9 above: it was incomplete since the barge was never raised so as to permit its bottom, and the planking beneath the sand-irons, to be examined. Consequently, here there is far greater force to the inference of some weakness or defect in the bottom which alone could explain the sinking and the inference, coupled with the elimination of other probable causes takes on such weight as to justify an affirmative finding that the barge was unseaworthy.

12. As between cargo and barge-owner there was no contract.

13. The barge-owner was not chargeable with a personal lack of due diligence in placing the barge under charter for the contemplated voyage.

This finding follows from Paragraph 7 above. The situation here was similar to that in Flat-Top Fuel Co. v. Martin, 2 cir., 85 F.2d 39. See discussion under Conclusion 13 as stated below.

## Conclusions

1. The contract between carrier and cargo was one of private carriage.

## Discussion

In Koppers Connecticut Coke Co. v. James McWilliams Blue Line, Inc., 2 Cir., 1937, 89 F.2d 865, McWilliams, the very carrier involved here, orally agreed to carry a cargo of coke for the libelant on a McWilliams barge, from New Haven, Connecticut, to Brooklyn, N. Y. In determining that the Harter Act did not apply to the contract of carriage, the court, quoting from its previous opinion in The Westmoreland, 2 Cir., 86 F.2d 96, 97, stated: "'The charter, being for the whole barge, made her a private carrier and left the parties free to contract as they chose.'" See also The Doyle, 3 Cir., 1939, 105 F.2d 113, 114.

The only new fact here not found in the Koppers Coke case, supra, is that a "tariff" of rates for carriage was published by McWilliams, and furnished to cargo, and presumably to other prospective shippers, before the oral contract was made. See Finding 6. This tariff was designated I.C.C. No. 7, and McWilliams was licensed and required to file such a tariff by the Interstate Commerce Commission. I hold, however, that the existence of this published tariff did not serve to transform a private carriage into a public carriage: It was the Congressional intent by the Transportation Act of 1940, 54 Stat. 898, 49 U.S.C.A. §§ 1 et seq., 901 et seq., not to change the liabilities of vessels, but merely to subject them to regulation. Cornell Steamboat Co. v. U. S., 321 U.S. 634, 64 S.Ct. 768, 88 L.Ed. 978.

■ 2. The contract between carrier and cargo by its terms was subject to the Carriage of Goods by Sea Act of 1936, Sec. 3, 46 U.S.C.A. § 1303, and the Harter Act, Sec. 3, 46 U.S.C.A. § 192, and for purposes of the latter act the carrier as to cargo stood as owner of the barge as well as of the tug. In re O'Donnell, 2 Cir., 26 F.2d 334; Sacramento Navigation Co. v. Salz, 273 U.S. 326, 47 S.Ct. 368, 71 L.Ed. 663; Commercial Molasses Corp. v. N. Y. Barge Corp., 314 U.S. 104, 62 S.Ct. 156, 86 L. Ed. 89.

■ 3. Although the contract by its terms was subject to the statutes cited, under the findings of no negligence as made in Finding 9 there was no room for the application of the exemption from liability contained in either of said statutes.

■ 4. The arrangement between barge-owner and carrier was not a contract of towage. Sacramento Navigation Co. v. Salz, 273 U.S. 326, 47 S.Ct. 368; In re O'Donnell, 2 Cir., 26 F.2d 334.

■ 5. Under the facts (see particularly Finding 7) carrier was the charterer of the barge and under the Carriage of Goods by Sea Act for lack of diligence in failing to ascertain whether the barge was seaworthy or to make it seaworthy the carrier became liable to cargo for its loss.

■ 6. The sinking of the barge without credible explanation of the cause supports a rebuttable inference that the barge was unseaworthy. The Jungshoved, 2 Cir., 290 F. 733; Commercial Molasses Corp. v. New York Tank Barge Corp., 2 Cir., 114 F.2d 248. Cf. Metropolitan Coal Co. v. Howard, 2 Cir., 155 F.2d 780.

■ 7. As between cargo and carrier under a private contract of carriage the ultimate burden of proof is on cargo to prove unseaworthiness but cargo in meeting the burden of proof may have the aid of the inference noted in conclusion 6. Commercial Molasses Corp. v. New York Tank Barge Corp., 314 U.S. 104, 62 S.Ct. 156; The W. H. Davis, D.C., 56 F.Supp. 564; Metropolitan Coal Co. v. Howard, supra.

■ 8. As against cargo and carrier the barge-owner did not stand as a carrier, either public or private, and neither the Carriage of Goods by Sea Act nor the Harter Act are applicable to the barge-owner.

■ 9. By the charter, barge-owner impliedly warranted to the carrier that the barge was in all respects seaworthy for the contemplated voyage. Cullen Fuel Co. v. Hedger, 290 U.S. 82, 54 S.Ct. 10, 78 L.Ed. 189.

■ 10. Neither cargo nor barge-owner is entitled to recover against the tug.

This conclusion, of course, necessarily follows from the finding of no negligence contained in Findings, Par. 9.

■ 11. By reason of its breach of implied warranty of seaworthiness, the barge-owner became primarily liable to cargo, the liability of carrier to cargo under Conclusion 5 being secondary.

## Discussion

It is true that there is no privity of contract between barge-owner and cargo so that barge-owner's warranty of seaworthiness did not expressly run to cargo. However, in such a situation as this there is authority for a direct recovery by cargo against barge-owner. Davis v. Dittmar, 2 Cir., 6 F.2d 141; Loveland Co. v. Eastern States Exchange, 3 Cir., 92 F.2d 180. The basis of such a direct recovery might more simply be explained by the third party beneficiary doctrine than the complicated rationale of the Dittmar case. See also Shamrock

278

Towing Co. v. Fichter Steel Corp., 2 Cir., 155 F.2d 69.

12. For its liability to cargo, carrier, under its claim in the limitation proceedings, is entitled to be exonerated by barge-owner.

13.[1] On the petition of the barge-owner for a limitation of liability under 46 U.S.C.A. § 181 et seq., as to cargo the burden of proof is on the petitioner-owner to prove its lack of privity or of knowledge, but having sustained that burden as found in Par. 13 of the Findings its petition should be granted as to cargo. Flat-Top Fuel Co. v. Martin, 2 Cir., 85 F.2d 39; see also Coryell v. Phipps, 317 U.S. 406, 410, 63 S. Ct. 291, 87 L.Ed. 363. As to the carrier, the petition for limitation should be denied. The Cullen No. 32, 2 Cir., 62 F.2d 68, affirmed 290 U.S. 82, 54 S.Ct. 10, 78 L.Ed. 189; W. E. Hedger Transp. Corp. v. Gallotta, 145 F.2d 870; Great Lakes Towing Co. v. Mills Transp. Co., 6 Cir., 155 F. 11; The Fred E. Hasler, 2 Cir., 65 F.2d 589; The Steel Inventor, D.C., 35 F.Supp. 986."

Ordered that decrees be submitted for entry, on notice unless notice be waived.

1. Conclusion 13 was amended after petition for rehearing to read as above set forth.