**THE HARPER NO. 145.**

**No. 193.**

Circuit Court of Appeals, Second Circuit.
June 2, 1930.

Duncan & Mount, of New York City (John A. McManus, of New York City, of counsel), for appellant J. W. Higman Co.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (Chauncey I. Clark and P. Fearson Shortridge, both of New York City, of counsel), for appellant Moran Towing & Transportation Co.

Slayton & Jackson, of New York City (G. Noyes Slayton, of New York City, of counsel), for appellant Weeks Stevedoring Co.

Macklin, Brown, Lenahan & Speer, of New York City (J. Dudley Eggleston and Horace L. Cheyney, both of New York City, of counsel), for appellee A. J. Harper.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

This libel was filed to recover for the loss of a cargo of chalk laden on the scow Harper No. 145. The owner of the chalk libeled the scow and sued the Moran Towing & Transportation Company, the charterer, and the latter impleaded the Weeks Stevedoring Company under the fifty-sixth Rule in Admiralty.

The Harper No. 145 was a new scow built in 1924 and completed in May of that year. She was chartered to the Moran Towing & Transportation Company under a demise charter whereby the owner paid the master who was the charterer's agent in respect to matters affecting the cargo. While under this charter, which began on June 1, 1924, and ran for four months, the Harper No. 145 carried full cargoes of ore, sand, humus, and coke before taking on libelant's cargo on August 27th and 28th, and developed no signs of leaking.

Libelant's cargo of 800 tons of chalk arrived at New York on the steamship Independence Hall, which was berthed at Pier 2, Hoboken. It was at first thought that the Harper No. 145 could take the entire 800 tons on board, but her master protested against such a heavy load, though, when the charter was entered into, the owner is said to have assured the charterer that 800 tons might be carried. By arrangement between the master and a representative of the charterer, the loading ceased at noon on August 28th, when 684 tons of chalk had been placed on board. The testimony indicates that the scow was trim, had a safe amount of freeboard, and did not appear to be leaking when the loading was completed.

As soon as the scow was loaded, three of the stevedores from the gang of the Weeks Stevedoring Company cast off her lines. She lay alongside the floating crane that was between her and the Independence Hall to discharge the chalk from the latter. The stevedores shifted her by hauling on her lines until she was in motion and then let her drift in toward the bulkhead. They then went ashore to dinner and paid no attention to the scow for about an hour, when one of them returned and reported to the foreman stevedore that she had "taken an awful list." The foreman at once proceeded to Pier 2 and found her starboard rail under water and about 24 inches lower than her port rail. A tug was secured to put in a siphon and to pump her out, but, before any progress could be made in doing this, the scow careened and dumped her cargo. Her master had gone ashore shortly after noon, as he said, to telephone to the charterer's agent that she "was loaded complete as she stood at noon." He returned just before she shipped her load. He testified that he had sounded the Harper No. 145 the afternoon before, as well as on the morning that she turned turtle, and had found no water in her on either occasion. But he had not gone through her with a lantern so as to discover any break in her hull. The survey made after the scow was raised disclosed a new fracture in a plank in the stern of the boat about six feet from the bottom, which the witnesses said was large enough to admit considerable water.

The District Court found: (1) That the barge was seaworthy when loaded; (2) that the stevedoring company was negligent in leaving her to drift, and that some blow she received while so drifting resulted in the broken stern plank which had caused the leaking; (3) that the stevedoring company and the Moran Company were both at fault in not heeding the objections of the bargemaster to the overloading of the scow and consequently were both liable for the damages sustained by libelant.

The trial judge accordingly dismissed the libel as against the Harper No. 145 and granted a final decree against the Moran Towing & Transportation Company and Weeks Stevedoring Company, Inc. The li-

belant appeals because the decree should have gone against the scow as well as against the Moran Company and the stevedoring company. The Moran Company and the stevedoring company each appeals on the ground that it was not at fault.

It is earnestly contended by all parties, except the owner of the scow, that she was structurally unseaworthy because she had not been properly caulked and because some of her top seams had dried out. The trial judge did not regard the proof of these defects as convincing in view of the testimony of the builder of the scow and of the inherent improbability that a newly built scow which had safely carried numerous cargoes between June 1st and August 22d should suddenly begin to leak only three months after she was put into service. We are of the same opinion, and hold that any loosening of the seams and displacement of the shutter-plank which may have been found at the survey is to be attributed to the severe strain suffered by the barge when she dumped her load and was raised by Merritt & Chapman, rather than to initial unseaworthiness.

The trial judge found that the barge overturned because water entered the broken plank in her stern. He concluded that the plank in question must have been broken through some impact that occurred when the stevedores cast off the lines of the scow and left her adrift in the slip. He realized the difficulty involved in reaching such a conclusion, and said in his opinion:

"How the fracture of the plank was caused does not appear. No direct evidence bears thereon, and hence we must look to the probabilities, taking into consideration the situation, facts and circumstances."

█ The scow carried her last prior cargo, which was one of coke, on August 22d. She apparently then had a full load and did not leak, so that we must assume that the break occurred later than that date. The owner has the burden of proving that his barge was seaworthy when the cargo of chalk was loaded. The leaking and capsizing on August 28 raised a presumption of unseaworthiness. Du Pont de Nemours v. Vance, 19 How. 162, 15 L. Ed. 584; The Jungshoved (C. C. A.) 290 F. 733; The Kathryn B. Guinan (C. C. A.) 176 F. 301. This presumption might of course be rebutted, and is sought to be met by the proof that the stevedores left the Harper No. 145 adrift in the slip. But while the stevedores were careless in not making the scow fast at her pier and in leaving her at large, it is nothing but speculation to say that the stern plank was broken because she was not made fast. There is no testimony that she collided with anything in the slip. It was presumably a sheltered place, and there is no more reason to suppose that the impact occurred during the hour when she was left adrift than during the five days prior to August 27 when she began to take the chalk on board and during which her movements are not accounted for except by the bare statement of her master that she never got into any trouble. We think that she was not shown to have been seaworthy when she took in libelant's chalk, but was seaworthy when chartered.

█ It is said that the scow must have received her injuries during the noon hour because she did not leak before. But we cannot know when the leaking began. No one examined her hull prior to the survey to see whether there was any fracture, and she might have had a fracture and yet have leaked little or none at all until her load got heavy enough to bring the water line above the break and the water pressure became great enough to make the leaking serious. The theory that the plank was broken through the carelessness of the stevedores was first suggested in a statement of the bargemaster made September 3, 1924, in which he said: "It might have been possible that while they were shifting the light scow and moving me from the position where I was that the heavy swells which were coming in the slip bumped the boats together and occasioned this break in the plank." This kind of statement accompanied by a deposition of the master unsatisfactory for vagueness and lack of memory is not enough to rebut the presumption of unseaworthiness which resulted from the leaking. S. C. Loveland Co., Inc., v. Bethlehem Steel Co. (C. C. A.) 33 F.(2d) 655.

When the master of the scow was asked in his deposition whether she hit anything, he replied: "This evidence will be in the statement in New York at the time. I do not remember the details." It is quite apparent that this man was a bargee of that inconspicuous mentality so common among persons of his calling, and that his suggestion in the statement we have quoted that the fresh break in the plank was due to the carelessness of the stevedores was the merest conjecture. Indeed in one part of his deposition he went so far as to say that he believed that he hauled the scow across the slip himself. While this was probably not the case, and there is no proof that the scow suffered any injuries while she was adrift, his statement

that he had some part in the maneuver shows that the injuries supposed to have been received at that time ought not lightly to be imputed to the stevedores.

█ The finding of the District Court that the stevedoring company and the Moran Company were at fault in not heeding the objection of the bargemaster to the overloading of the scow is unwarranted by the evidence. The only objection the master made was to a load of 800 tons. He never objected to the load which she carried, and the testimony indicates not only that the 684 tons actually put on board were satisfactory to him and to Cunningham, the representative of the charterer, but also that this was a safe load and less than the vessel had carried before. The District Judge confused the bargee's objection to carrying 800 tons with a supposed objection which he never made to the 684 tons actually loaded. We accordingly hold that neither the stevedores nor the charterer were in fault for loading the barge as they did.

█ It follows from the foregoing that the barge was not unseaworthy when delivered to the charterer but became so while in the hands of the charterer and before libelant's chalk was taken on board. Accordingly, the charterer, who was the carrier and owner pro hac vice, became liable for the loss of the cargo, and the scow Harper No. 145 was likewise liable in rem. The Poznan (D. C.) 276 F. 418, 432; The Esrom (C. C. A.) 272 F. 266, at page 269; The Robert R. (C. C. A.) 255 F. 37; The Willie (C. C. A.) 231 F. 865; The New York (D. C.) 93 F. 495, at page 498; The Euripides (D. C.) 52 F. 161. The owner turned over a new seaworthy barge to the charterer, and, inasmuch as she received injuries which rendered her unseaworthy while in the possession of the latter, the negligence of the charterer is presumed in the absence of any explanation. These unexplained injuries caused her sinking and the loss of the cargo. The charterer is therefore primarily liable for libelant's damages as between it and the scow Harper No. 145. While this primary liability could have been passed on to the stevedoring company by showing that the latter was responsible for the injury to the stern plank, the attempt to shift the loss failed for lack of proof.

It may be argued that the scow ought to be held primarily liable because the bargee, who was paid by the owner, did not examine her with sufficient care to discover the break in the stern plank. But he did take soundings on the afternoon of August 27th and the morning of August 28th and found no water. This would seem to have been enough in the case of a harbor scow that was new and had carried her last cargo safely, at least in the absence of proof that he knew of any collision that might have been likely to injure her hull.

The decree is modified so as to hold the Moran Towing & Transportation Company primarily and the scow Harper No. 145 secondarily liable for the damages awarded to libelant and to dismiss the libel as against the Weeks Stevedoring Company, Inc. Costs are allowed to libelant as against Moran Towing & Transportation Company and the scow Harper No. 145 and to Weeks Stevedoring Company, Inc., as against the libelant.