TAYLOR BROS. LUMBER CO., Inc., v. SUNSET LIGHTERAGE CO. et al.

THE SUNDIAL.

No. 310.

Circuit Court of Appeals, Second Circuit.

July 14, 1930.

William F. Purdy, of New York City, for appellant.

Single & Single, of New York City (Gregory S. Rivkins, and Frank H. Gerrodette, both of New York City, of counsel), for libelant-appellee.

William J. Mahar, of New York City, for respondent-appellee.

Before MANTON, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

SWAN, Circuit Judge.

Under a bill of lading issued by Transmarine Corporation, pitch pine lumber owned by the libelant was shipped on the steamer Sunewarkco from Mobile, Ala., to Port Newark, N. J., whence it was to be lightered to a dock on the East River, New York City. To perform the lighterage, Transmarine Corporation on November 24, 1926, orally chartered the lighter Sundial from appellant at an agreed daily hire. While the lighter was lying alongside the steamer on a quiet night, with no wind, and during the loading of the lumber upon the lighter in the early morning of November 29th, she listed, dumping part of her load, careened to the opposite side, throwing off the remainder, and then filled with water and sank decks to. Some of the lumber was salvaged; some floated away and was lost. The libel was brought to recover the cargo damage thus sustained, and the court below, concluding that the lighter must have sprung a sudden leak, imposed liability on both the lighter and her owner upon the theory that she was unseaworthy. The impleaded charterer was exonerated.

The owner attempted by testimony of the lighter's so-called captain to explain the casting of her load as caused by swells from a passing tug of unknown ownership, but the District Court rejected this story as unworthy of belief. Two possible explanations remain: Unseaworthiness causing her to leak; or improper loading causing her to list and cast her cargo. It is unnecessary to choose between them in order to decide the rights of the cargo owner as against the chartered Sundial. Upon either explanation she would be liable, for the cargo owner has a lien, enforceable by a libel in rem, on the vessel which receives his goods and fails to make right delivery, whether her failure be due to unseaworthiness, as in The New York, 93 F. 495, 498 (D. C. E. D. N. Y.), The Euripides, 52 F. 161 (D. C. S. D. N. Y.), and The Jungshoved, 290 F. 733 (C. C. A. 2), or to improper loading, as in The Centurion, 57 F. 412, 416 (D. C. S. D. N. Y.), reversed on other grounds 68 F. 382 (C. C. A. 2), The Alert, 61 F. 113 (C. C. A. 2), and The Willie, 231 F. 865 (C. C. A. 2). Hence the decree against the lighter was correct.

The charterer was also liable. It was the carrier of the cargo and the owner pro hac vice of the lighter, and was liable in personam to the cargo owner for nondelivery. See cases, supra, and J. W. Higman Co. v. The Scow Harper No. 145, 42 F.(2d) 161, decided by this court, June 2, 1930.

The more serious question is which must bear the ultimate burden; that is, whether the lighter is primarily liable and her charterer only secondarily so, or vice versa. If the lighter was seaworthy when delivered, and the accident happened because of unseaworthiness caused by something which transpired while in possession of the charterer, the latter is primarily responsible. The Higman Case, supra. Primary liability of the charterer would also be established if the accident was due to negligent loading. See The Alert, supra; The Willie, supra. The owner's petition impleading the charterer alleges that, if damage occurred as alleged in the libel, it was due to the fault and neglect of the charterer. On this issue the owner has the burden of proof, but is aided by presumptions in case he proves delivery in a seaworthy condition. Such proof makes a prima

facie case for the owner and casts on the charterer the burden of explaining what was done with the boat after delivery so as to negative the presumption of negligence, although the ultimate burden of proving negligence of the charterer remains on the owner. Terry & Tench Co. v. Merritt & Chapman D. & W. Co., 168 F. 533 (C. C. A. 2); Hildebrandt v. Flower Lighterage Co. (D. C.) 277 F. 436, affirmed 277 F. 438 (C. C. A. 2); National Lighterage Corp. v. Transmarine Corp., 35 F.(2d) 1020 (C. C. A. 2); The Raymond M. White (D. C.) 290 F. 454, 458, affirmed 296 F. 1023 (C. C. A. 2). While these rules of presumption have usually been stated in suits by the owner for damage to a demised vessel returned in poor condition, they are equally applicable where, as, in the present case, the owner seeks indemnity against the imposition of liability upon the boat because of the charterer's use of her.

This brings us to the evidence and requires consideration of the owner's proof of seaworthiness at the time of delivery and the charterer's explanation of its use of the lighter thereafter. The lighter was delivered at Brooklyn on November 24, 1926, and was towed by the Transmarine Corporation to Port Newark, where she arrived on the 24th or 25th. Apparently loading began on the 27th or 28th; in the meantime no use being made of her. Her captain testified that nothing happened to her until she dumped her load. Before delivery, Whalen, the owner's representative in making the charter, went through her hold, examining her from end to end with a pocket flash-light. He testified that she was tight and sound and in first-class condition. He also said that she was "in service right along" carrying cargoes without trouble. Omitting the testimony of the lighter's captain because the trial judge refused to credit anything he said without corroboration, Tully was the only eyewitness of the accident. He was an employee of the Transmarine Corporation, acting as night foreman in charge of discharging the steamer. He came on duty at 7 p. m. on November 28th, and superintended the loading of the lumber upon the Sundial. At his 10 o'clock inspection "everything was all right" and the lighter's captain reported no water in the lighter's hold. At midnight when he went to supper she was on an even keel, and so she was when he returned an hour later. Loading continued, and at about 2:30 on the morning of the 29th Tully observed that the lighter had a slight list toward the steamer. To straighten her up he put two drafts of lumber, each weighing about 3,000 pounds, upon the opposite side. This brought her to an even keel, but in a minute or two she started to list away from the ship; and a minute or two later threw off part of her load. Then she swung back, dumping the rest of her load toward the ship, and settling decks to. When the lighter careened she had less than a full load; her capacity being at least 225,000 board feet of lumber and about 190,000 having been loaded. On December 3d she was towed to dry dock, and a survey disclosed several bottom planks started and the bilge log bruised. One of the surveyors testified that impact of the lighter with the ship caused by swells would be a competent explanation of such injuries, but that impact caused by slipping of the cargo would hardly be sufficient.

The District Court said in his opinion that he could not find "any positive evidence of improper loading." Disregarding Rohan's testimony, which he discredited, there was none. Therefore he concluded that the lighter must have sprung a leak and taken in enough water to cause her to careen. We concur; if improper loading be eliminated, the fact of sinking in calm weather and smooth water raises a presumption of unseaworthiness. The Jungshoved, supra; the Higman Case, supra. So the critical question becomes whether the lighter's leaky condition existed when she was delivered under the charter or arose later. On this issue the trial court decided against the owner. The proof of seaworthiness on November 24th is not so strong that we can say this was wrong. Whalen's inspection was made when the vessel was light and subjected to none of the water pressure caused by a heavy load. When she was subjected to a load four days later she began to leak. There was no proof of her age or when she was last dry-docked or repaired. It is true that Whalen said she had been "in service right along carrying cargoes," but there is no evidence as to when her last prior cargo was carried or of what it consisted, or where she had been between that time and delivery under the charter. The charterer showed that between delivery and the accident she had merely been towed light from Brooklyn to Port Newark and "nothing had happened to her." On this record, we think the court's conclusion that she was not proved seaworthy on delivery was justified.

On the argument the libelant admitted that no liability in personam against the own-

er was established in favor of the libelant. The decree in this respect is reversed. The Sundial is primarily liable and Transmarine Corporation secondarily so.

The decree will be modified accordingly, and, as thus modified, is affirmed. Costs in this court are to be paid by the appellant.