## TEXAS GULF SULPHUR CO. v. O'DONNELL.

## THE ARTHUR R. FALLON.

District Court, S. D. New York.
Nov. 28, 1938.

Hill, Rivkins & Middleton, of New York City (Thomas H. Middleton, of New York City, of counsel), for libellant.

Macklin, Brown, Lenahan & Speer, of New York City (L. F. Hanan, of New York City, of counsel), for respondent.

CLANCY, District Judge.

On March 6, 1937 the respondent's barge, Arthur R. Fallon, was chartered to Texas Gulf Sulphur Company. Prior to that time the barge had been carrying corn and wheat in the vicinity of New York apparently without damage to the cargoes. The libellant and respondent had dealt with each other for a number of years and O'Donnell knew the barge was to carry a sulphur cargo and that the charter was for an indefinite period of time. At all times during the period of the charter an employee of O'Donnell was in charge of the barge. All unloading was arranged for by the Texas Gulf and was done by their employees or by dock employees. Although O'Donnell generally put its barges into drydock for repairs every five years, the Fallon had not been put into drydock for a period of six years preceding the charter to Texas Gulf. Above water repairs had been made. Pursuant to directions the barge was delivered at the Erie Basin, Brooklyn, New York, where the charterer put 998.6 tons gross of sulphur aboard the Fallon. Thereafter, following directions of the libellant conveyed to O'Donnell, who owned tugs as well, respondent had the barge moved as hereafter recited either with his own tugs or other tugs. Texas Gulf was billed separately for this service by the respondent whether accomplished with his own or other tugs. On March 8, the Fallon was towed to pier 11 of the West Shore Railroad Company, West New York, New Jersey, where part of her cargo was discharged. At that place the discharging was done with a fixed electric crane which took sulphur out of the hatch designated by the captain. To appose the designated hatch to the crane the employees at the pier moved the barge by a steam winch and a line attached to the bow quarter cleat, so that tension on the line swung the bow off the dock and the stern against it. The Fallon was moved around at pier 11 and may have bumped against the spiles which protruded from the dock's face, but there is no evidence that any damage was caused to her at that time. On March 24 the Fallon was towed from pier 11, West New York to pier 10, Jersey City where more of her cargo was discharged. Here the crane used in discharging her was movable and she held her original position at the dock. There is evidence that the barge "sat in the mud" while at this pier but there is none that this caused any damage. On April 6, the Fallon was returned to pier 11, West New York where more of her cargo was discharged in the same manner as before. On July 17, when the barge was loaded with approximately 348 tons of sulphur, it was towed to Columbia Street, Brooklyn, to receive more sulphur from the steamship Wisconsin. On July 15 or 16 Joyce, who theretofore had been the bargee, had fallen ill and left the barge. Matthews, also an employee of O'Donnell and bargee of the F. F. Storm at the same slip, then kept an eye on the Fallon until the tug called for her on the 17th and the tug's deckhand, Pearson, took over. Matthews said there was then four

and one-half inches of water in the bilge and Pearson said he saw Matthews sound. On the morning of the 17th, when the barge reached Columbia Street, Hoffman, who was watchman and caretaker on the neighboring Carpenter barge, went on board the Fallon to take charge. It would appear, therefore, that from March 6th to July 17th the Fallon was subjected to normal care and treatment; that no one complained or knew of any injury to her and that during all that time the barge was apparently seaworthy and required little pumping. Although Columbia Street was busy there ·is no eye witness of any injury there. During the night another barge was laid along her port side. In the evening Hoffman left the barge for six or seven hours, returning at midnight at which time his inspection disclosed no damage. At 7 o'clock in the morning when Hoffman opened the hatches he found water therein and immediately put the pumps to work. This all happened before any more sulphur was taken on board from the steamship Wisconsin. A subsequent survey showed that the sulphur in the No. 5 and No. 6 bins was wet and the water marks indicated that salt water had risen two feet above the ceiling. The forward bins, however, were dry.

Hoffman, after putting pumps to work, examined the barge for a leak which he found to be on the right side of the stern. He thereupon filled this leak, which was below the water line, from the outside by lowering dry waste which was sucked into the leak and, when saturated, swelled, stopping the leak. On the morning of August 2 the Fallon was drydocked and on August 3 a Texas Gulf surveyor, who had been notified of the hauling only the afternoon of the day before though on July 26th he asked to be present at her hauling, attended at the drydock and found that the Fallon had been caulked and that there were two short pieces of new planks in the starboard stem. This surveyor claimed that Hoffman told him that he had found the leak on the starboard side about ten feet aft the bow. This was apparently a misapprehension of the news for Mr. Feeney, who was present at the drydock on August 2, testified that one plank, just below the light water mark, on the stern was split to the extent of twelve inches from the starboard side and splintered and that the spikes were started one inch on the other which bore a protruding splinter and that the cracks

or breaks appeared to be fresh and new, and the surveyor's testimony of repairs to the stem must be judged in the light of this misapprehension. Feeney testified that the other repairs were general ones. The bargee, Joyce, who had returned to duty, testified to substantially the same effect. I find as a fact that a fresh crack existed in one plank after the damage on the stern extending about ten inches in from the starboard side and beneath the light water line and that the adjoining plank was splintered and started fresh. Admitting that the failure of the owner to give the charterer's surveyor an opportunity to see the vessel in drydock before the repairs were begun casts a suspicion upon the testimony of the owner's witnesses, there is nothing in the case to sustain such a suspicion or to engender utter disbelief in them or their evidence.

The charter implies a clear covenant of seaworthiness at the time the barge was delivered into the charterer's service and the burden of proving its seaworthiness thus rests upon the owner. We think he has successfully borne it. The charterer says that the position of the barge's injury below the waterline and the ease with which Hoffman effectively caulked it with waste shows the injury was old; that a similar temporary caulking job had been performed and a bump of some kind had released it during the night so that the leaking resumed. This explanation, in the first place, is a sheer guess. It is wholly imaginative and it taxes the Court's credulity. It supposes the survival of a shoddy repair job through at least six months' normal service, knocking about the docks, for the work of the barge from January 1 was accounted for. It implies perjury in the testimony of Joyce and Feeney which the Court believes an unfair and unfounded implication. The barge had not been docked for six years it is true but it had borne from a thousand to four hundred tons dry for four months and cargoes of wheat and corn two months before that with no indication of any existing fault and we find her seaworthy as a fact when she entered the charterer's service.

The burden of proof of proper care by the charterer or of some explanation of the injury that would exonerate it thus becomes its burden. The Sundial, 2 Cir., 43 F.2d 700. How the injury occurred we do not pretend to know but

we need not decide here who is responsible for the damage but only determine that the loss as between these parties will not fall on the wrong person. We rest on the presumption that the charterer was negligent when injury occurred to a seaworthy vessel during the charter period and remains unexplained. The Sundial, supra; The Harper No. 145, 2 Cir., 42 F. 2d 161. The Fallon had four and one-half inches of water in her bilge when she left West New York. Though O'-Donnell procured the Lee tug for this tow he apparently acted as an independent contractor and anyway nothing untoward seems to have transpired during the trip. What caused the tearing loose and splitting of her stern timbers and the consequent leak the charterer must explain and since it has failed to do so I hold it has failed to make a case. O'Boyle v. U. S., 2 Cir., 47 F.2d 585.

Libel dismissed.