ÆTNA INS. CO. v. FLORIDA TOWING CORPORATION et al.

THE J. F. CO. 62.

District Court, S. D. Florida, Jacksonville Division.

March 5, 1941.

Walter F. Rogers, of Jacksonville, Fla., for libellant.

Bedell & Bedell, of Jacksonville, Fla., for respondents.

STRUM, District Judge.

Chase & Company engaged W. T. Coppedge and Florida Towing Corporation, as private contract carriers, to transport a cargo of fertilizer materials, owned by Chase & Company, from Jacksonville to Sanford, Florida. Coppedge and Florida Towing Corporation furnished the Lighter "J.F. 62" for the purpose of transporting said cargo, said lighter to be towed by a tug belonging to the Towing Corporation.

The cargo arrived from abroad aboard the steamer Nordfarer, which arrived and moored at the Municipal Docks in Jacksonville on August 28, 1939, at about 7 P. M. The lighter had been previously placed, late that afternoon, alongside the Municipal Docks by a tug of the Towing Corporation, and upon arrival of the Nordfarer the same tug placed the lighter "end to" the dock, just ahead of the Nordfarer, so that the cargo could be transferred from the Nordfarer to the lighter. This transfer was begun about 1 A. M., August 29, 1939, the cargo being stevedored from the ship to the lighter by the Jacksonville Municipal Docks, which had complete charge of the transfer operation and loading of the lighter, under employment by Chase & Company. Loading was commenced by first placing the cargo at the end of the lighter farthest from the dock.

This lighter, "J. F. Co. 62," was about 75 feet long and 26 feet in beam, with a load capacity of 150 to 175 tons. Its main deck was flat and housed. Both ends were square, with about a 45 degree "rake" from the water line up to near the deck of the lighter. About 2:15 o'clock A. M. in the morning of August 29, 1939, when about 42 tons of cargo had been placed in the outboard end of the lighter (away from the dock) that end of the lighter sank, with the result that the cargo was submerged and damaged.

Aetna Insurance Company, insurer of the cargo, paid Chase & Company and here sues as subrogee.

When the lighter commenced sinking, it was discovered that a piece of planking on the outboard end of lighter (away from the dock), about 6 feet long, 10 inches wide and three inches thick, had become unfastened, leaving a hole of these dimensions in that end of the lighter about 2 feet below the level of the main deck, and about 3 feet above the normal draft line of the lighter when not loaded, the lighter, when light, having about five feet freeboard. Sinking was caused by water entering through the hole, when the lighter was loaded sufficiently to lower the opening to the water line. This opening was at the corner, where the end and the side of the lighter join. The loose board was still hanging in a perpendicular position at its inboard end, but otherwise was completely out of place. The length of the displaced board showed that, when in place, it would extend out over the side of the lighter about $\frac{1}{4}$ inch, a situation not unusual in this type of water craft. There was evidence of a scraping or scouring along the side of the lighter near the end of this plank. It appears from the testimony that when the lighter was placed "end-to" the dock late in the afternoon, the tug captain sounded the bilge, and found only a negligible amount of water therein. The general foreman of the Municipal Docks looked the lighter over, after dark and before the loading commenced, but discovered no defects. There was no movement of other vessels in the slip where the lighter was moored, either before or during loading, except for the arrival of the Nordfarer, which did not touch the lighter.

When it was first noticed that the lighter was sinking, she had on board about 42 tons of cargo and it was about 2:15 o'clock in the morning of August 29, 1939, which was a Tuesday morning. The lighter, although owned by another company, had been in use by respondent Florida Towing Corporation for some time previous to this incident. On the preceding Thursday, it had carried about 160 tons of cargo without mishap, and had been loaded with a substantial cargo up to within a few hours before being placed at the Municipal Docks to receive the cargo in question. It was of good construction, had been frequently sounded and found tight, and other than for the defect hereinabove stated was in good condition. The bilges were last sounded about 7:30 P. M., August 28th.

There is no serious controversy as to the amount of damage to the cargo, but the respondents Coppedge and Florida Towing Corporation assert a counterclaim for $141.70 for the reasonable value of its services in salvaging the damaged cargo. Total damage to the cargo was $1,876.31, against which libellant has credited $525, the salvage value of the damaged cargo, leaving a net loss and claim against respondents of $1,351.31.

■ As private contract carriers, respondents Coppedge and Florida Towing Corporation owed to their employer, Chase & Company, the duty to provide a seaworthy vessel for the carriage of said cargo, and reasonable and ordinary inspection and care in and about its transportation.

■ It is undisputed that the cargo was in good condition when placed on board the lighter, and that it was there damaged. This raises a rebuttable presumption of negligence on the part of the carrier. It is incumbent upon the respondents in the circumstances to explain and exculpate themselves. In this, the respondents have failed. The Joseph J. Hock, 2 Cir., 70 F.2d 259; Nederlandsche v. Mediterranean & General Traders, 5 Cir., 17 F.2d 586; The Harper No. 145, 2 Cir., 42 F.2d 161; Toyo v. Willits & Co., 9 Cir., 17 F.2d 762; The Rosalia, 2 Cir., 264 F. 285. Compare Commercial Molasses Corp. v. New York Tank Barge Corp., 2 Cir., 114 F.2d 248. It is unnecessary, however, to rest liability in this case on a presumption of negligence, as negligence on the part of the carrier is affirmatively established by the evidence. There can be no doubt that the hole was in the lighter when the cargo was loaded, and reasonably diligent inspection would have disclosed it.

■ Notwithstanding the fact that the entire cargo had not yet been delivered to the respondent carrier, there had been a delivery pro tanto of that portion which had been loaded, which is here in controversy. As to that portion which had been loaded, for the purpose of being transported without further orders, respondents' liability as bailee, as a private contract carrier, had attached when the damage occurred. Delivery thereof was complete. It was out of the stevedore's hands. Nothing remained to be done which would make delivery more final or complete than it then was.

■■ As the lighter was in good condition on the preceding Thursday, and up to late afternoon of the day in question, during all of which time it had been in possession of respondents Coppedge and the Towing Corporation, and as the lighter sank as soon as a substantial part of the cargo was placed aboard her, it is clear that the lighter became unseaworthy while in the hands of the respondents Coppedge and Florida Towing Corporation. It was negligence on the part of said respondents, and a breach of the implied warranty of seaworthiness, to supply and receive cargo aboard a lighter in the unseaworthy condition in which this lighter is shown to have been when the cargo was loaded.

■ As respondents are private contract carriers, the Harter Act, 46 U.S.C.A. § 190 et seq., does not apply. Koppers Connecticut Coke Co. v. James McWilliams Blue Line, 2 Cir., 89 F.2d 865, certiorari denied 302 U.S. 706, 58 S.Ct. 25, 82 L.Ed. 545. Nor are respondents relieved of liability by the Carriage of Goods by Sea Act, § 4, 46 U.S.C.A. § 1304, as due diligence to make the lighter seaworthy was not used, and the defect was open and patent.

Respondents contend that due diligence was exercised. It is true that the master of the tug sounded the bilges late in the afternoon before the cargo was loaded, and the superintendent of the Terminal testified that he looked around the lighter after dark and did not discover this opening in the end of the lighter. This, however, is negative testimony, and will not overcome the conclusive fact that the opening was there when loading commenced. This is

784

not a question of a latent or hidden defect. This condition was open, patent, and obvious upon a reasonably careful inspection.

█ As it appears that the lighter became unseaworthy while in respondents' hands, and before the cargo was taken on board, the lighter in rem and respondents Coppedge and Florida Towing Corporation as bailees, are liable for the damage to the cargo. The Harper No. 145, 2 Cir., 42 F.2d 161.

Respondents' counterclaim is denied.

Decree for libellant.