## THE SEABOARD NO. 21.

### SEABOARD SAND & GRAVEL CORPORATION v. MORAN TOWING CORPORATION et al.

No. A–17024.

District Court, E. D. New York.

April 9, 1945.

Foley & Martin, of New York City (Christopher E. Heckman, of New York City, of counsel), for libellant.

Macklin, Brown, Lenahan & Speer, of New York City (Leo F. Hanan, of New York City, of counsel), for respondent.

Hill, Rivkins & Middleton, of New York City (Thomas H. Middleton, of New York City, of counsel), for respondent-impleaded.

MOSCOWITZ, District Judge.

Libellant's scow Seaboard No. 21, hereinafter referred to as No. 21, was damaged on March 9, 1944, at about 4:30 a.m. due to overturning while alongside the SS. Schoharie at Pier 33, East River. The libellant instituted this action against the Moran Towing Corporation, the respondent, to recover damages sustained by the No. 21. The respondent has impleaded the Terminal

Stevedoring Company, Inc. under a petition which alleged that the respondent-impleaded improperly loaded the scow.

The libellant in its libel charged that the respondent had breached the contract for the chartering and hiring of the scow by failure to return the scow to the libellant in the same condition as when received. When the scow was returned it was found to be damaged due to the negligence of the respondent.

Prior to March 6, 1944, libellant chartered the No. 21 to the Christie Scow Corporation under the usual form of harbor charter for an indefinite period of time. The Christie Scow Corporation agreed to supply a man who would act as watchman on the scow. Such person was the agent, servant and employee of the libellant.

On March 6, 1944, the respondent chartered the scow No. 21 from the Christie Scow Corporation. When the charter was made the Christie Scow Corporation was acting as a principal and was not acting as an agent or for the account of the libellant. There was no contractual relationship between the libellant and the respondent. Had the Christie Scow Corporation been a party (and it is not clear why that was not done) there would have been the usual presumption that there was a burden upon the charterer, the Christie Scow Corporation, to establish freedom from negligence as the No. 21 was returned in a damaged condition. In view of the fact that there was no contractual relationship between the libellant and respondent there can be no such presumption here. Even assuming that there was such a presumption, the testimony of the libellant, the respondent and the respondent-impleaded establish beyond peradventure that there was no negligence on the part of the respondent.

It is the position of the respondent-impleaded that the scow having careened in a quiet slip creates a presumption of her unseaworthiness and the burden of proof is upon her owner to rebut the presumption and to show her seaworthiness at the time she was loaded with the ballast at the Schoharie. Assuming that that statement of law is correct and that is indicated in The Harper No. 145, 2 Cir., 42 F.2d 161, the libellant has more than met its burden by showing conclusively that the No. 21 was in all respects seaworthy at the time of the accident.

At the time the No. 21 was chartered by the respondent she was in all respects tight, strong, staunch and seaworthy. In June 1942 she had been thoroughly searched and caulked, and in March 1943 certain repairs were made which placed her in a good seaworthy condition. Immediately prior to March 6, 1944, she had been in continuous service carrying various types and quantities of cargo. On February 17, 1944 she had been thoroughly examined and found seaworthy by libellant's employees.

On March 6, 1944, the No. 21 was towed to SS. Lieutenant Delatour at the south side of Pier 16, East River where she remained until March 8, 1944, at 11 a.m. She was loaded with approximately 600 tons of sand ballast by employees of the respondent-impleaded. The ballast from the SS. Delatour was loaded on the No. 21 to the port of the center line and when completed the No. 21 had an 18 inch list to port on which side she drew only 8 inches of water and every seam on that side of the No. 21 was submerged. During the afternoon on March 8, 1944 respondent was informed that the scow North River, which had been sent to the Schoharie at Pier 33, East River to receive all the slag ballast from that ship, would not be able to carry all of it and another scow was required. At about 5:30 p.m. respondent's runner visited the scow at Pier 16, East River, and observed that she was listed to port, however there was no water in her. It was further reported to respondent that the No. 21 should be sent to the Schoharie at Pier 33, that she could take about 100 tons. At that time the respondent's representatives knew that slag would be loaded on the pile of sand ballast already on board the No. 21, which had not been trimmed. On March 8, 1944, at about 8 p.m. the No. 21 was towed alongside the Schoharie at Pier 33, East River to receive the slag ballast. At that time the No. 21 was still listed to port when she arrived at the side of the Schoharie.

The libellant claims fault on the part of the respondent in not seeing to it that the list was corrected and fault on the part of the respondent-impleaded in dumping slag ballast from the Schoharie on the No. 21 without any trimming of either the slag or the sand. There is no charge of fault in the libel against the respondent-impleaded as to any act performed by the respondent-impleaded prior to the arrival of the No. 21 alongside of the Schoharie. It

having not been alleged in the libel the Court will assume as between the libellant and the respondent-impleaded that there was no negligence upon the part of the respondent-impleaded prior to the arrival of the No. 21 alongside of the Schoharie.

The testimony concerning the conditions which existed prior to the arrival of the No. 21 alongside the Schoharie was accepted against the respondent only but such testimony shows no fault on the part of the respondent or the respondent-impleaded. The captain of the No. 21—evidently a man of some experience with boats—could not have considered the situation dangerous because he was in his cabin at the time when the No. 21 turned over. When the No. 21 was alongside of the Schoharie prior to the unloading of the slag ballast from Schoharie, although she had a list, there was no danger and she was in good order and condition.

The accident was caused without any fault on the part of the Moran Towing Corporation; it is absolved of all liability. There was no fault on the part of the libellant. The No. 21 was staunch and seaworthy and the evidence is convincing that the accident was caused solely through the fault of the respondent-impleaded and the Court would be justified in making a decree against the respondent-impleaded based upon its own testimony because it affirmatively appears from the testimony of the respondent-impleaded that its negligence was the sole cause of the accident. Libellant's and respondent's testimony is to the same effect.

■■ The employees of the respondent-impleaded were incompetent and inexperienced. The man in charge of dumping the buckets by which the slag ballast was transferred had little experience and was incompetent. The time-keeper who supervised the work had been working a great many hours and was in the habit of sleeping during the progress of the operation. The employee who actually dumped the buckets had about eight weeks experience. He did not know how to trim the load or to load the No. 21 properly. An experienced man would have distributed the load more evenly. One of the employees of the respondent-impleaded worked continuously for 48 hours. While the Court will take judicial notice of the manpower shortage, and such condition should be considered by the Court, the shortage can not excuse negligence. This condition can not relieve the respondent-impleaded of its obligation to use reasonable care. Employees of the respondent-impleaded loaded the slag ballast on the untrimmed piles of sand ballast. The sand ballast did not serve as a proper foundation for the heavier slag ballast. There was extreme danger of the sand sliding and thus permitting the slag to slide and run to one side. The slag ballast varied in size from powder to lumps of about 8 inches square. The No. 21 was loaded with the slag ballast for about four hours transferring between 35 to 39 tons per hour. Had the No. 21 cargo been properly stowed and trimmed she could have carried about 750 tons. While loading the No. 21 the work was suspended to repair a winch. During this time the scow overturned and the captain was drowned.

The conclusion is inescapable that the cause of the accident was due to the improper loading of slag ballasts on the untrimmed piles of sand in an excessive quantity without trimming either the slag ballast or the sand ballast to avoid the danger of sliding and running of the load.

Upon the evidence it has been determined that the libellant is entitled to a decree against the respondent-impleaded, and the respondent is entitled to a decree dismissing the libel.

The Court has accepted some of the libellant's, the respondent's and respondent-impleaded's proposed findings of fact. The Court specifically makes the following findings of fact and conclusions of law:

### Findings of Fact.

1. Libelant a New York Corporation was at all material times the owner of the scow Seaboard No. 21, which prior to March 6, 1944, had been chartered to Christie Scow Corporation under the usual form of harbor charter for an indefinite period of time. Libelant was to furnish a man to act as watchman of the scow.

2. Prior to March 6, 1944, respondent, Moran Towing Corporation, a New York Corporation, chartered the scow Seaboard No. 21 from Christie Scow Corporation agreeing to pay Christie Scow Corporation a higher daily rate. The charter was the usual harbor one for an indefinite period of time, Christie Scow Corporation agreeing to supply a man to act as watchman of the scow. That the bargee in charge of the scow Seaboard No. 21 at all times involved herein was the servant, agent and employee of the libellant.

3. On March 6, 1944, respondent, Moran Towing Corporation, a New York corporation, chartered the scow Seaboard No. 21 from Christie Scow Corporation, agreeing to pay Christie Scow Corporation a higher daily rate of charter than Christie Scow Corporation was paying to libellant. The charter was the usual harbor charter for an indefinite period of time, and when the Christie Scow Corporation made the charter it was acting as a principal for and on its own account and was not acting as an agent or for the account of the libellant herein.

4. The Seaboard No. 21 entered the charter service of the respondent, Moran Towing Corporation, on March 6th, 1944 at which time she was tight, strong, staunch and seaworthy. She had been thoroughly searched and caulked in June, 1942 and in March of 1943 such repairs as were then necessary to put her in good condition had been made. Prior to entering the service of respondent, Moran Towing Corporation, the scow had been in continuous service carrying various types and quantities of cargo. On February 17, 1944, she had been thoroughly examined and found seaworthy by two of libelant's employees.

5. There was no contract of charter between the libellant, Seaboard Sand & Gravel Corporation and the respondent, Moran Towing Corporation, and the libellant by reason of its charter with the Christie Scow Corporation did not have possession of the scow and could not deliver or bail the scow to Moran Towing Corporation.

6. Under and by reason of its charter with Christie Scow Corporation respondent, Moran Towing Corporation on the afternoon of March 6, 1944, took the said scow and began to use it in its business.

7. On March 6, 1944, respondent, Moran Towing Corporation, had the Seaboard No. 21 towed to the S. S. Lieutenant Delatour at the south side of Pier 16, East River where until 11:00 A.M. on March 8, 1944, she was loaded with approximately 600 tons of sand ballast by the employees of respondent, Terminal Stevedoring Co., Inc., a New York Corporation.

8. The ballast from the S. S. Delatour was loaded on the Seaboard No. 21 to port of the center line and when completed the scow had an 18 inch list to port on which side she drew only 8 inches and every seam on that side of the vessel was submerged.

9. On the afternoon of March 8, 1944, respondent, Moran Towing Corporation, received advices that the scow North River, which it had sent to the Steamer Schoharie at Pier 33, East River to receive all the slag ballast from that ship, would not be able to carry all of it and that another scow was required.

10. At about 5:30 P.M. on March 8, 1944, Berg, a runner for Moran Towing Corporation, visited the scow Seaboard No. 21 at Pier 16, East River, and observed that she was listed to port because of the way the sand ballast had been loaded. There was no water in the Seaboard No. 21. Berg reported to the respondent, Moran Towing Corporation, that the Seaboard No. 21 should be sent to the Schoharie at Pier 33 and that she could take about 100 tons. At that time, both Berg and Johnson, the despatcher for Moran Towing Corporation, knew that slag would be loaded on the pile of sand ballast already on board the Seaboard No. 21, which had not been trimmed.

11. At about 8:00 P.M. on March 8, 1944, respondent, Moran Towing Corporation, caused the Seaboard No. 21 to be towed to a position alongside the S. S. Schoharie at Pier 33, East River to receive the slag ballast. The Seaboard No. 21 was still listed to port when she arrived at the side of the Schoharie.

12. Safety required that the 600 tons of sand ballast already on board the Seaboard No. 21 be trimmed by the stevedores to correct the list before that scow be sent to receive slag ballast.

13. The transfer of the slag ballast from the Schoharie to the Seaboard No. 21 was performed by the respondent, Terminal Stevedoring Co., Inc.

14. The slag ballast was removed from the hold of the Schoharie by tubs, the contents of which were dumped on the sand on the Seaboard No. 21 without any trimming of either the slag or the sand.

15. The employees of respondent, Terminal Stevedoring Co., Inc., in charge of loading the Seaboard No. 21 at the Steamship Schoharie considered that the Seaboard No. 21 could receive all of the ballast remaining in the S. S. Schoharie which exceeded 100 tons, the amount Moran Towing Corporation's runner, Berg, had told the scow man would be loaded at the Schoharie.

16. The man in charge of dumping the buckets by which the slag ballast was transferred from the Schoharie to the Seaboard No. 21 had little experience and was incompetent. The time keeper who supervised the operation of loading the scow had been working a great many hours and was in the habit of sleeping during the progress of the work.

17. It was improper and negligent for the respondent, Terminal Stevedoring Co., Inc., to load slag ballast on the untrimmed piles of sand ballast—600 tons—which had been so loaded that the Seaboard No. 21 was listed heavily to port. The sand ballast did not serve as a proper foundation for the heavier slag ballast and there was danger of the sand sliding thereby permitting the slag to slide and run to one side. The slag ballast varied in size from powder to lumps of about 8 inches square.

18. Respondent, Terminal Stevedoring Co., Inc., loaded the Seaboard No. 21 with slag ballast for about 4 hours transferring an average of about 35 to 39 tons per hour.

19. If the cargo on the Seaboard No. 21 had been properly stowed and trimmed she could have carried from 730 to 750 tons but could not have done so if the cargo were not properly stowed and trimmed.

20. Before the Terminal Stevedoring Co., Inc. had finished loading the Seaboard No. 21 and while work was suspended to repair a winch the scow overturned and the scow man was drowned.

21. The agents and servants of respondent-impleaded started transferring ballast material from the S. S. Schoharie to the scow No. 21 at 10:00 p.m. of March 8, 1944, and continued until midnight, when loading was stopped for supper. Loading of the scow was resumed at 1:00 a.m. of March 9, and continued until 3:00 a.m., at which time further loading had to be discontinued because the ship's winch broke down.

22. The scow turned turtle, dumping her deck cargo in the slip, and sustained hull damages and also drowned her captain, at 4:30 a.m. of March 9, 1944.

23. The overturning of the Seaboard No. 21 was due to the loading of slag ballast on the untrimmed piles of sand in an excessive quantity without trimming either the sand ballast or the slag ballast to avoid the danger of sliding and running of the load.

24. The respondent, Terminal Stevedoring Co., Inc., was negligent in loading an excessive quantity of slag ballast on the Seaboard No. 21 when she was listed and without trimming the sand ballast already on board.

25. The libelant and man in charge of the Seaboard No. 21 were without fault.

26. That the careening of the scow Seaboard No. 21 was not caused or contributed to by the respondent, Moran Towing Corporation.

27. The respondent-impleaded, Terminal Stevedoring Co., Inc., were not the servants, agents or employees of the respondent, Moran Towing Corporation as they had been employed by the representatives of the S/S Schoharie to perform the stevedoring services.

28. The respondent, Moran Towing Corporation was without fault and caused no damage to the scow Seaboard No. 21.

## Conclusions of Law.

1. The charter of the scow Seaboard No. 21 by Seaboard Sand & Gravel Corporation to Christie Scow Corporation was a demise charter, but the bargee remained the servant, agent and/or employee of the libellant herein.

2. That when the scow Seaboard No. 21 was chartered by Christie Scow Corporation to Moran Towing Corporation the bargee remained the servant, agent and/or employee of the libellant herein.

3. That the libellant herein was responsible for the acts of the barge of the scow Seaboard No. 21.

4. There was no privity of contract between the libellant and the Moran Towing Corporation, and the libellant did not have such possession of the scow Seaboard No. 21 as to enable it to either make a contract with Moran Towing Corporation or to deliver or bail the scow to said respondent.

5. The libellant has failed to sustain its burden of proof as to proving negligence against the respondent, Moran Towing Corporation.

6. The Moran Towing Corporation has shown every act performed in connection with the scow Seaboard No. 21 and that none of the acts caused any damage to the scow Seaboard No. 21.

7. That the respondent, Moran Towing Corporation was without fault.

8. That the overturning of the Seaboard No. 21 was not due to any act of the respondent, Moran Towing Corporation.

9. That the respondent, Moran Towing Corporation is entitled to a decree dismissing the libel and petition as to it, together with costs.

10. Respondent, Terminal Stevedoring Co., Inc., was negligent in that its employee was inexperienced and incompetent and in that it loaded on the Seaboard No. 21, already in a badly listed condition, more slag ballast than she could safely receive without trimming of the piles of sand already on board.

11. Libelant was without fault.

12. The scow Seaboard No. 21 was seaworthy when delivered to respondent, Moran Towing Corporation.

13. Libelant is entitled to a decree against the Terminal Stevedoring Co., Inc. Settle decree on notice.