**THE C. W. CRANE.**

**C. W. CRANE CO., Inc., v. EVANS TRANSP. CORPORATION et al.**

**U. S. COMMERCIAL CO. v. C. W. CRANE CO., Inc., et al.**

Nos. 16954, 17213.

District Court, E. D. New York.

July 26, 1945.

See, also, 62 F.Supp. 619.

Mahar & Mason, of New York City (Frank C. Mason, of New York City, of counsel), for libelant C. W. Crane Co., Inc.

Horace T. Atkins, of New York City (William Weymar, Jr., of New York City

of counsel), for libelant U. S. Commerical Company.

Forrest E. Single, of New York City (Forrest Single, of New York City, of counsel), for respondent Evans Transportation Corp.

Foley & Martin, of New York City (Christopher Heckman, of New York City, of counsel), for respondent Seaboard Great Lakes Corporation.

Purdy & Lamb, of New York City (Edmund Lamb, of New York City, of counsel), for M. J. Rudolph Co., Inc.

KENNEDY, District Judge.

These cases were tried together. In the first case the libel alleges that the respondent Evans Transportation Corp. chartered the scow C. W. Crane, which is owned by libelant, on September 2, 1943, and returned the scow in badly damaged condition on September 29, 1943. The Evans Transportation Corp. took the necessary steps to implead the Seaboard Great Lakes Corporation on the ground that the Seaboard Great Lakes Corporation had sub-chartered the same scow from Evans on September 27, 1943. Seaboard then impleaded M. J. Rudolph Co., Inc., asserting that the cause of the disaster was improper loading.

In the second case the U. S. Commercial Company asserts in its libel that the scow C. W. Crane, her owners, the charterer and sub-charterer, and the stevedore were jointly responsible for the loss of the cargo which had been put on the C. W. Crane on September 29, 1943. The libel against the C. W. Crane is in rem.

The cargo consisted of ore which was being removed from the S. S. Harpalycus at Pier 33, Brooklyn. Libelant U. S. Commercial Company alleges that it employed Seaboard to receive, transport and deliver 2,500 tons of ore from the Harpalycus to the Central Railroad Company of New Jersey at Jersey City. Seaboard admits that it was requested by Furness Withy & Company to remove and transport the ore, and that the C. W. Crane was one of the vessels supplied by it.

On September 1, 1943, the president of Evans Transportation Corp. telephoned to Zeller Marine Corporation (agent for libelant) and as a result of this communication chartered the C. W. Crane for an indefinite period at the rate of seventeen dollars per day. The charter included the services of the scow captain. The C. W. Crane was inspected by the superintendent of C. W. Crane Co., Inc., on August 28, 1943, or five days before she was turned over on charter to Evans. Prior to the commencement of this charter, and in January, 1943, the C. W. Crane was completely overhauled in drydock. Between January and August, 1943, she was carrying sand and ballast and general cargo, and on August 28, 1943, when she was examined both inside and out by the representative of her owners, she was loading oil and had on board some 13,000 five-gallon cans.

The C. W. Crane is 115 feet long and her beam is 35 feet. She is a deck-scow with raked ends and has cargo bulkheads on each end. Her living quarters are aft. She has a capacity of about 850 tons and is eleven or twelve years old.

Between September 2, 1943, and September 27, 1943, the C. W. Crane made four trips between Port Johnson and New York City piers loaded with vehicles. She never carried a load at any time during that period anywhere near 850 tons.[1] On September 27, 1943, Evans[2] received an inquiry from Seaboard concerning the possibility of supplying boats to remove 1,200 tons of ore from S. S. Harpalycus. Evans then communicated with the agents representing the owners of the C. W. Crane and asked about her capacity. He was told she would be able to take 600 tons of ore, and Evans then sub-chartered the C. W. Crane to Seaboard. On September 27, 1943, the C. W. Crane was at Pier 14, North River. A tug called the American Eagle which was being operated by Seaboard picked up the C. W. Crane and another scow, Metropolitan 150, and towed them to Pier 33 Atlantic Basin, Brooklyn. The Harpalycus was starboard side to. A scow called the Shamrock was lying alongside of her bow, and upon her arrival the C. W. Crane tied up to the Shamrock. Later, on the afternoon of September 27th, the C. W. Crane was shifted by a steam

---

[1] The evidence is quite unsatisfactory as to the exact amount she carried during this period. However, the strong probability is that her load never exceeded 300 tons. She was carrying military vehicles and the exact number and weight was apparently never communicated to the charterer.

[2] For brevity, I shall refer to the respondent Evans Transportation Corp. as "Evans," to the respondent Seaboard Great Lakes Corporation as "Seaboard," and to M. J. Rudolph Co., Inc., as "Rudolph."

lighter operated by the stevedores' respondent, M. J. Rudolph Co., Inc. Eventually, on September 28th, the C. W. Crane was placed alongside of the Harpalycus and the Metropolitan 150 was moored outboard of the C. W. Crane. The stevedores commenced loading ore on the C. W. Crane on the afternoon of September 28th and worked until about 8 p. m. on that night. The ore was loaded in three piles pretty much the same height. The tops of the piles were lower than the cargo bulkheads on the C. W. Crane. The scow was not listed at that time and had merely an average drag aft. Her freeboard was about six feet at the stern, and a little more at the bow.

The bargee of the C. W. Crane testified that at about 11 o'clock on the evening of September 28, 1943, the velocity of the wind increased and the Crane commenced to grind into the side of the Harpalycus. This bargee, Shankland, testified that on the morning of September 29th he called one Doyle, representative of Seaboard, and told him that the scow was in a rough spot. Shankland said that Doyle told him to communicate this information to Evans Transportation Corp. Shankland said he did this and told Mr. Evans not only that he was in a bad spot but also that the Metropolitan 150 was leaking. Shankland attributed the grinding of the C. W. Crane against the Harpalycus not only to the wind but also to heavy traffic in Buttermilk Channel. He admitted that he did not communicate his condition to his owners, but said he called Seaboard because he knew that that company had his scow under charter, and that they had a tug which could take care of the situation. At any rate, on September 29, 1943, the Crane was shifted from the stern to the bow of the Harpalycus and loading was resumed. At about 5:45 p. m. on September 29th, when the C. W. Crane had between 400 and 500 tons of ore on board, Shankland heard a hissing noise in the hold. He then discovered that he had a leak. Having discovered the leak, Shankland attempted to caulk it with oakum. Since he did not have enough oakum on board he went over to the Metropolitan 150 and secured some there. He then stopped the loading and telephoned to Doyle Doyle told Shankland that he could not get in touch with the American Eagle for about an hour. As a matter of fact, the tug arrived at about 6:45 p. m. on September 29th. The captain of the American Eagle came on board

the C. W. Crane and looked down the hatch. He then put his siphon into the port after corner of the C. W. Crane, although the scow at that time was listed to starboard.

It is quite clear in the evidence that the siphon was defective. The fact is that earlier on the same day, namely, from 2:30 p. m. to 3 p. m., an attempt was made to pump out the Metropolitan 150 with the same siphon. It is obvious that the captain of the American Eagle knew that it was not in good working condition because he left the Harpalycus and got a gasoline pump in Greenpoint which he brought back to the Metropolitan 150. Kivlan, the captain of the American Eagle, said he was afraid the Metropolitan 150 might sink while his tug was away, which explains his leaving the gasoline pump. I believe, however, that he got that pump because his own siphon was not in working order and that he knew it. Not only did it blow steam at the joints; it did not pump any appreciable quantity of water. Realizing this, the captain of the American Eagle, after using that same siphon on the C. W. Crane for a short time, attempted to get assistance from the tug Julia F. Moran which happened to be passing by. He then put a line on the C. W. Crane and pulled her stern away from the Harpalycus. Shortly after that, the C. W. Crane careened to starboard. At that time Shankland, the scow captain, was on board the American Eagle.

It is clear beyond dispute that there was no fault on the part of Rudolph and I shall, therefore, make no further reference to that respondent. It is also clear that neither the owners of the C. W. Crane nor Evans is chargeable with any negligent conduct which was a proximate cause of the disaster. Really, the principal question for decision is when and why the C. W. Crane became unseaworthy.

Seaboard urges that either the scow was unseaworthy in the hands of Evans, or she became so as a result of the neglect of the bargee during September 28th and September 29th. To support its contention, Seaboard relies in part upon the presumption of unseaworthiness that arises when a vessel sinks in calm water. It also argues that because of his failure to use his pumps, the bargee, the servant of the owner, was responsible for the sinking. Actually, the decision in these cases turns upon the resolution of a pure issue of fact. The

briefs of counsel are in complete accord concerning the law applicable to cases like this.

Seaboard complains that there is no adequate proof that the C. W. Crane was seaworthy when she was delivered to Evans, and that this dearth of proof, coupled with the presumption of unseaworthiness which I have mentioned, causes the loss to fall on the scow and her owners. However, there is proof in the record that on August 28th, five days before she went on charter to Evans, the C. W. Crane was in good condition. The witness Kenny testified that he made an inspection on that date, at a time when the C. W. Crane was partially laden. He examined her inside and out, and found no evidence of leaks or other defective condition. It is quite inconceivable to me that on August 28th or September 2nd the starboard stern corner of the C. W. Crane was in anything like the condition disclosed by the photographs in evidence, which were taken after the survey. I acknowledge that the mere fact of satisfactory service by the scow between September 2nd and September 27th is not conclusive evidence that such a leak did not exist. However, it is far more probable that the condition which led to the disaster arose on the night of September 28th and the morning of September 29th, and was caused by the scow grinding against the Harpalycus.[3] It is true that the weather report showed nothing like wind of gale velocity. But the scow's berth was exposed to the swells of Buttermilk Channel, and her bargee attributed the grinding to this in part, at least. Curiously enough Doyle, who was called as a witness by Seaboard, said that such grinding was not unusual at Pier 33, although he later said he was talking about the berth at Pier 33 under severe weather conditions.

But more important than all of this is the series of events which took place during the morning and early afternoon of September 29th. There can be no doubt that the bargee telephoned both to Doyle and to Evans on the morning of that day, and warned them that the scow ought to be moved. Evans was vague about any such conversation, but did not really deny that it had taken place. Doyle, in his testimony, at first made no reference to any such telephone call, but later admitted having received a call from the bargee on that day, although he placed it in the afternoon.

I believe the bargee called Doyle, both in the morning and in the afternoon of September 29th,[4] and that Seaboard could have prevented the disaster.

Another practically undisputed fact which sheds light on this controversy is the fact that the Metropolitan 150, lying just outboard of the C. W. Crane, was also in difficulty. And as early as 3 p. m. on that day it is clear that Kivlan, the master of the tug American Eagle, and servant of Seaboard, knew that the Metropolitan 150 was in sinking condition, and knew that his siphon was useless. This is demonstrated by his trip for the gasoline pump which he left on the Metropolitan 150. I know there is nothing in the evidence to show what condition the Metropolitan 150 was in before September 29th. I merely mention the matter because it is quite consistent with the story told by the bargee of the C. W. Crane concerning the grinding that had taken place the evening before, and concerning the strong necessity that something be done to prevent further trouble at that berth.

The presumption of unseaworthiness is merely a portion of the evidence (Commercial Molasses Corp. v. New York Tank Barge Corp., 2 Cir., 114 F.2d 248, affirmed on rehearing, 314 U.S. 104, 62 S. Ct. 156, 86 L.Ed. 89). There have been cases where proof of seaworthiness at the time of delivery on charter has been held to be insufficient (e. g. The Irving, D.C., 16 F.Supp. 22, affirmed Conners Marine Co. v. Manhattan Lighterage Co., 2 Cir., 91 F.2d 1011, The Sundial, 2 Cir., 43 F.2d 700, The Cullen No. 32, 2 Cir., 62 F.2d 68, affirmed 290 U.S. 82, 54 S.Ct. 10, 78 L.Ed. 189). It is strongly urged by Seaboard

---

[3] The bargee became very confused when he was asked about dates. At times he seemed to be testifying that he telephoned Doyle on September 28th, and that the scow was grinding on the evening of September 27th. Careful reading of the record shows that this is a mere surface confusion because the bargee "goes by the days." When he was asked questions on the basis of days of the week, rather than on the dates of the month, it became obvious what he meant. The grinding of the scow against the Harpalycus took place on the evening of September 28th; the telephone calls during the morning and the afternoon of September 29th.

[4] See footnote 3, supra.

that these cases are in point, and that in fact they rule this case. However, on all of the evidence, it is clear to me that the C. W. Crane was seaworthy on September 2nd when she was delivered to Evans, that she was seaworthy on September 27th when she was delivered to Seaboard, and that she became unseaworthy in the hands of Seaboard because of the grinding which she had sustained on the evening before.

Moreover, after this condition of unseaworthiness came into existence Seaboard, on notice that the scow was in trouble, did not carry out its duty of ordinary care. The loading was continued during the afternoon of September 29th. Between two and three hours prior to the sinking, Seaboard knew that she had sprung a bad leak. Nearly two hours after it was thus notified, Seaboard sent to the relief of the scow a tug owned and operated by itself. Although it had earlier been demonstrated that the tug's siphon was useless, her master, a servant of Seaboard, made ineffectual attempts to use it until it was too late.

The conduct of the tug's master after the sinking was of the same pattern. He drove some spikes in the bottom of the scow, made a line fast, and then attempted to tow her into a more sheltered berth in Hamilton Ferry dock. Although he eventually tied her up there, she broke adrift three times during the operation. These salvage measures could not have been commenced until about 8 p. m., yet the American Eagle was safely tied up at Pier 8, North River, by 10:30 p. m., at a time when the C. W. Crane had broken away from her berth at Hamilton Ferry and was presumably drifting down toward Jay Street, where she was found next morning.

It is doubtless true, as Seaboard urges, that the American Eagle did not take on the full responsibility which is imposed on a tug in towage cases. But the tug surely had the duty of ordinary care. Her master was the servant of Seaboard, and Seaboard is chargeable with his neglect.

Seaboard's claim that the bargee is responsible for all that happened is not supported by the evidence, nor are cases like Sinram v. Pennsylvania R. Co., 2 Cir., 61 F.2d 767, or the Mars, D.C., 9 F.2d 183, in point. It is clear in principle that, although not much is expected of a bargee, he has a definite duty to be something more than a mere automaton. And so it was

held in the Sinram case and in the Mars case that he cannot invite trouble to his own scow. He cannot permit her to be operated when he knows she is in a badly damaged condition.

But the bargee in this case was a great deal more attentive to his duty than bargees usually are. Long before the sinking, he complained about the berth and notified both Seaboard and Evans that the scow had sustained damage. He stopped the loading as soon as he was sure that the scow was leaking, he did his best to stop the leak, and more than two hours before she sank, he again notified Seaboard that she was in peril. I do not think his failure to pump contributed in the slightest way to the disaster. It was Seaboard's conduct rather than his that was the proximate cause of the sinking.

If I am right in all of this, then it is clear that in the hull suit the scow and her owners are entitled to a decree making Seaboard primarily liable and Evans secondarily liable. Rudolph is entitled to a dismissal.

It is also quite clear that in the cargo suit, Seaboard is primarily liable to the shipper, U. S. Commercial Company, and that Evans, Rudolph and C. W. Crane Co., Inc., are entitled to a dismissal of the cargo libel.

I think a different disposition must be made of the libel in rem by the shipper against the scow C. W. Crane. During the time she was being laden, the C. W. Crane became unseaworthy and this, I think, created a lien in favor of the shipper, making the scow secondarily liable in rem (The Harper No. 145, 2 Cir., 42 F.2d 161, certiorari denied, sub. nom. Moran Towing & Transportation Co. v. J. W. Higman Co., 282 U.S. 875, 51 S.Ct. 79, 75 L.Ed. 772). There are cases where the shippers' maritime lien against the vessel is not enforced because, for example, the charterer has used her in a manner not contemplated by the charter party (Armour & Co. v. Ft. Morgan S. S. Co., 270 U.S. 253, 46 S.Ct. 212, 70 L.Ed. 571). In the case last mentioned, the Supreme Court affirmed a judgment dismissing the libel, at least partially on the ground that there had been an unauthorized conversion of the vessel into a cattle ship. But it seems to me that no such circumstances are present here, and so far as the liability in rem is

632

concerned, that this case is on all fours with The Harper No. 145, supra.

Neither the cargo libelant nor the scow have briefed the point which I mention. It is, therefore, quite possible that I have overlooked some ground for a dismissal of the cargo libel against the scow. If that is so, counsel may submit authorities, and I will reconsider this point only, namely: whether the scow can be held secondarily liable in rem to the shipper, even in the absence of privity of contract and merely because she became unseaworthy in the hands of the charterer. On principle, I should think she ought to be. As between a blameless owner and a blameless shipper in a case of that kind, I should think that with very few exceptions the loss ought to fall on the vessel itself; otherwise, there is no real security in maritime liens which, as I understand it, arise by operation of law and not from the acts of the parties.

In the hull suit, an appropriate decree should be entered holding Seaboard primarily liable and respondent Evans secondarily so. In the cargo suit, saving the point I have mentioned, a decree should be entered holding Seaboard primarily liable, and the scow C. W. Crane secondarily liable in rem.

I have filed findings of fact and conclusions of law.